630 N.E.2d 1180 (1994)
258 Ill. App.3d 954
197 Ill.Dec. 56
In re JOSEPH B., Jr., a minor (People of the State of Illinois, Petitioner-Appellee, v. Angela S., Respondent-Appellant).
No. 1-93-1950.
Appellate Court of Illinois, First District, Fifth Division.
February 25, 1994.
*1182 Annette R. Appell of Northwestern University Legal Clinic and Peter Koch, Senior Law Student, Chicago, for appellant.
Jack O'Malley, State's Atty. (Roland W. Burris, Atty. Gen., Rosalyn B. Kaplan, Sol. Gen., Gary T. Morgan, Guardian Adm'r, Deborah L. Ahlstrand, Asst. Atty. Gen., of counsel); and Patrick T. Murphy, Kass A. Plain, Office of the Cook County Public Guardian; Shelly Rice Weinberg, and Ann L. Gibson, Coffield Ungaretti & Harris, Chicago for appellee.
Justice GORDON delivered the opinion of the court:
On July 12, 1991, Angela S. executed a document entitled "Final and Irrevocable Consent to Adoption" which provided that she did "consent and agree to the adoption" of her son, J.B. Pursuant to court order, J.B. was placed with his godmother (Z.S.) who initially agreed to adopt him. In April 1992, however, Z.S. changed her mind and that adoption did not proceed. At that time, DCFS took J.B. from Z.S.'s home and placed him in a foster home. On August 13, 1992, approximately thirteen months after Angela signed the original consent and without any further notice to Angela, the Department of Children and Family Services (DCFS) sought and obtained an order terminating her parental rights and authorizing it to consent to J.B.'s adoption. On November 16, 1992, Angela filed a motion to void her consent of July 12, 1991, and vacate the August 13, 1992, order terminating her parental rights. In an order entered May 14, 1993, the trial court denied that motion and Angela now appeals.

FACTS
In 1989, Angela lived with her husband and their four children, one of whom was J.B. On April 10, 1989, a neglect petition was filed in juvenile court by the Department of Children *1183 and Family Services. In that petition, DCFS alleged that J.B. had been neglected and that his environment was injurious to his welfare. On May 11, 1989, the trial court entered an order of protection with respect to J.B. which provided that J.B.'s parents must provide all care necessary for his wellbeing, attend counseling and not engage in any domestic violence in the presence of J.B. On September 12, 1990, DCFS filed a petition for supplemental relief in which it was alleged that J.B.'s parents had violated the protective order in that Angela had cut J.B.'s father with a knife and threatened to kill him. Pursuant to that petition, the trial court ruled that J.B. remain under the order of protection. At some point after this petition was filed, Angela and J.B.'s father separated and began living apart.
On July 12,1991, Angela appeared in court and moved to vacate the order of protection. During that appearance her attorney, a public defender, stated that Angela was "asking to be relieved of her parental responsibilities." The following colloquy then occurred:
"THE COURT: The mother is asking that the 2-25 [order of protection] be vacated and custody be placed with the Department of Children and Family Services?
[ANGELA'S ATTORNEY]: Yes, Judge.
THE COURT: Is that correct, mother?
[ANGELA]: Yes.
THE COURT: Do you understand you don't have to do this if you don't want to? Do you understand that?
[ANGELA]: Yes.
THE COURT: Do you understand that I will be vacating the existing 2-25 order? That I will be placing temporary custody with the Department of Children and Family Services. This is what you want to do?
[ANGELA]: Yes.
THE COURT: Are you doing it freely and voluntarily?
[ANGELA]: Yes.
THE COURT: By agreement, I vacate the 2-25 protective order. By agreement, combining probable cause, and immediate necessity shown, I grant temporary custody to the DCFS with the right to place."
At that point the guardian ad litem moved that J.B. be placed with Z.S. who according to the record had expressed an interest in adopting J.B. and who was purportedly caring for Angela's three other minor children. Angela joined in this motion and pursuant thereto J.B. was so placed.
The following colloquy then occurred:
"[ANGELA'S ATTORNEY]: At this time, resident mother is seeking to sign, in open court, an irrevocable consent of adoption with respect to each of the four minors.
THE COURT: Mother, at this time, your attorney tells me you wish to sign what is called a final and irrevocable consent of adoption; is that correct?
[ANGELA]: Yes.
THE COURT: Now ma'am, do you understand you do not have to sign this document if you do not want to?
[ANGELA]: Yes.
THE COURT: Do you also understand if, in fact, you sign this document, it is irrevocable and it is permanent? You cannot come into this court or any other court and seek to have this turned around. Do you understand that?
[ANGELA]: Yes.
THE COURT: Do you understand that, by signing this document, you are consenting to the child being adopted? Do you understand that?
[ANGELA]: Yes.
THE COURT: You're giving up your parental rights; do you understand that?
[ANGELA]: Yes.
THE COURT: And, again, I want you to understand, clearly, that it is an irrevocable act and you cannot come into this court or any other court to seek to have it overturned; do you understand that?
[ANGELA]: Yes.
THE COURT: And that is what you want to do?

*1184 [ANGELA] As long as their placement is with [Z.S.]"
Angela then proceeded to sign a final and irrevocable consent for adoption with respect to J.B. In response to questions posed by her attorney, she again stated that it was her wish to give up J.B. for adoption and that she was doing so freely and voluntarily. The following exchange then occurred:
"[ANGELA'S ATTORNEY]: Do your understand, even if you sign the documents, these documents today, that [J.B.] will not be immediately placed for adoption? Do you understand that?
A: Yes.
Q. Do you understand that, when and if the parental rights of the parties are terminated, it is still uncertain?
A. Yes.
Q: Do you understandIs it you wish that the children be placed with [Z.S.]?
A. Yes, it is.
Q. Is it your wish that the children eventually be adopted by [Z.S.]?
A. Yes.
Q. Do you understand upon signing these documents, there is no guarantee that [Z.S.] will eventually be able to adopt your children?
A. Yes.
* * *
Q. Do you understand that your signature on the final and irrevocable consent to adopt is in no way [contingent] upon your being able to see [J.B.] later?
A. Yes.
Q. Within one month or one year or one day after signing this, if [Z.S.] says you cannot see the children, you cannot come back to court and say, I want to take my signature off of those documents because she said I could come see [J.B.]; do you understand that?
A. Yes.
* * *
Q. And you know that you cannot come back into this court or any other court at any future date to seek to undo your surrendering of parental rights?
A. Yes."
After this questioning by her attorney, the court asked Angela the following question.
"THE COURT: And does she understand by signing these documents it is not contingent upon the children being placed with Z.S.? Do you understand that?
[ANGELA]: Yes."
Angela then proceeded to sign a form entitled "FINAL AND IRREVOCABLE CONSENT TO ADOPTION." In this form, Angela did "hereby consent and agree to the adoption of such child" and understood that "by signing this consent [she] irrevocably and permanently [gave] up all custody and other parental rights [she had] to such child." She also understood that "such child will be placed for adoption and that I cannot under any circumstances, after signing this document, change my mind and revoke or cancel this consent or obtain or recover custody of any other rights over such child." The case was continued until September 12, 1991, for summons on J.B.'s father. As of that time, no order was entered terminating Angela's parental rights and no order provided for the appointment of a guardian with the right to consent to J.B.'s adoption.
On September 12, 1991, at which time J.B.'s parents were apparently still separated, J.B. was adjudicated a neglected minor and made a ward of the court with DCFS appointed as J.B.'s guardian. The court's order purported to be premised with respect to Angela on her signing of the consent form without any finding that she was unfit. The court indicated that J.B.'s father, who did not attend the children, was unwilling to care for J.B.
At some subsequent time, Z.S. decided against the adoption of J.B. DCFS then removed J.B. from Z.S.'s home and placed him with a foster family on April 25, 1992. DCFS did not notify Angela that the initial proposed adoption by Z.S. had been disrupted or that J.B. had been placed in a different home.
*1185 On June 30, 1992, DCFS filed a supplemental petition asking that a guardian with the right to consent to adoption be appointed. The petition alleged that J.B.'s father was unfit pursuant to Ill.Rev.Stat.1991, ch. 40, par. 1501(D). This petition represented that Angela "previously surrendered the child to a duly licensed welfare agency for adoption, and has voluntarily terminated her parental rights, and waived notice of all subsequent legal proceedings." On August 13, 1992, a hearing was held on DCFS's motion. Angela was not present at this hearing nor was she notified that this hearing was taking place.
At that hearing held in Angela's absence, Mary Kay Hampton, the DCFS caseworker assigned to the case stated that J.B. was initially placed under an order of protection because of extreme domestic violence in the home. She represented that at a progress call in that case Angela consented to J.B.'s adoption in open court.
Patricia Reynolds testified that J.B. was placed with a new foster family on April 25, 1992. She stated that J.B. was in need of counseling to help him deal with the separation from his siblings. She stated that the foster parents caring for him at that time wanted to adopt the child and that it was in J.B.'s best interests that parental rights be terminated and that he be adopted by those foster parents.
The trial court granted DCFS's motion, authorizing it to consent to J.B.'s adoption and terminating both parent's parental rights. In so doing, the court took judicial notice that Angela signed a final and irrevocable consent to the adoption of J.B. on July 12, 1991. The court found that J.B.'s father was unfit under Ill.Rev.Stat.1991, ch. 40, par. 1501(D). The trial court did not make a finding that Angela was unfit.
On November 10, 1992, Angela filed a motion to revoke her consent and vacate the August 13, 1992, order terminating her rights. By that time, J.B., had been removed from the foster parents to whom Reynolds referred at the August hearing. In December 1992, he was placed with a new foster family who subsequently initiated adoption proceedings. In January 1993, an interim order granting the prospective adoptive parents temporary legal custody was entered in a different proceeding by a different trial judge. The entry of a final order in the adoption proceeding was stayed pending the resolution of Angela's motion to revoke her consent and vacate the August order terminating her parental rights.
On May 14, 1993, the trial court conducted a hearing on Angela's aforesaid motion. In conducting this hearing, the trial court stated that it was limiting the hearing to the revocation of the consent and was not conducting a hearing to determine Angela's fitness.
DCFS objected to Angela's motion, contending that her motion to void her consent was filed more than one year after she signed the consent and was therefore barred under the applicable statute of limitations. (750 ILCS 50/11 (West 1992).) In response, Angela argued among other things the doctrine of equitable estoppel. She stated that she had not taken any action to vacate her consent sooner because of misleading representations by a DCFS caseworker that she could do nothing to revoke her consent. The trial court then proceeded to hear testimony on Angela's failure to file her motion within the statute of limitations for the purpose of determining whether that statute of limitations would apply to bar her from challenging the consent.
At the hearing, Angela testified that when she signed the consent it was her understanding that Z.S. was going to adopt J.B. She further stated that she first heard that Z.S. had abandoned any interest in adopting J.B. when she telephoned Z.S. on Easter Sunday, 1992, and was told that J.B. was no longer living there.
She stated that she contacted DCFS the next day and eventually met with Mary Kay Hampton, the DCFS caseworker assigned to the case, on May 17, 1992. Angela's mother also attended this meeting. When Hampton confirmed that J.B. was going to be adopted by a different foster family, Angela told Hampton that she wanted him back. Hampton responded that there was nothing Angela could do about the adoption because "[i]t's out of the court system." Angela testified *1186 that she believed Hampton and did not seek advice from an attorney at that time.
Angela testified that although she was unaware of the hearing, her mother was aware of that hearing and attended it with J.B.'s father. According to Angela, her mother called and advised her of the August 13th hearing and that the case was still active in court. After she talked to her mother, Angela contacted the Public Defender's Office sometime between August 1992 and November 1992. Angela said that she did not contact an attorney earlier because Hampton told her that she could not go back to court. Angela also testified that DCFS never advised her that J.B. was no longer living with Z.S. although, as previously mentioned, she learned of that fact on her own initiative on Easter 1992. On cross-examination, Angela admitted that she knew Hampton was a DCFS caseworker and not an attorney and that Hampton never told her that she could not contact an attorney.
Angela's mother testified that she was present at the meeting between Hampton and Angela. She stated that they discussed J.B., his well being, and his new adoptive parents. She said that Angela asked about getting J.B. back, but Hampton told her that she had signed her rights away and that she could never get them back. She also testified that she attended the August 13, 1992, hearing which she apparently learned of from a call from J.B.'s father with who she attended the hearing. After attending the hearing, she contacted Angela and told her that they should get an attorney and try and get J.B. back.
The trial court determined that Angela's claim was time-barred as it was not filed within the one year statute of limitations established in section 11 of the Adoption Act. The court rejected Angela's equitable estoppel claim, stating that Angela did not get "improper advice which was rendered by someone through an attorney from someone perhaps a lawyer who was working on the other side." In an order entered on that date, May 14, 1993, the trial court denied Angela's motion.
Angela filed her notice of appeal on June 2, 1993. Pursuant to a motion filed by Angela on June 21, 1993, this appeal was placed on an accelerated docket and expedited. The parties, DCFS together with the Office of the Public Guardian representing J.B., and the current prospective adoptive parents who were given leave to appear as amicus curiae (all of whom are hereinafter collectively referred to as "appellees"), completed their briefs and oral argument on an accelerated basis.

OPINION
On appeal, Angela contends that her consent to the adoption of J.B. was voided when the proposed adoption by Z.S. was disrupted and that consequently the May 14, 1993, order terminating her parental rights predicated upon that consent must be vacated. She argues that the trial court erred in finding that her motion to void her consent and vacate the order terminating her parental rights was time-barred because: (1) that motion was not based on fraud or duress and thus was not within the one year statute of limitations contained in section 11 of the Adoption Act (750 ILCS 50/11 (West 1992)); (2) there had been no final adoption of J.B.; and (3) Hampton's misrepresentations dissuaded her from filing the motion within the limitations period. Angela further asserts that the May 14, 1993, order is void because she was not served with summons or notified of the supplemental petition to terminate her parental rights. We agree with Angela's contention that her consent may not be construed to apply to all future adoptive parents, but must be limited to those whose adoption was contemplated when the consent was signed. However, we agree with the trial court that her belated attempt to void her consent to anyone else but Z.S. was timebarred.
"Adoption is the legal and social process by which a nonbiological parent-child relationship is created." (In re M.M. (1993), 156 Ill.2d 53, 62, 189 Ill.Dec. 1, 619 N.E.2d 702.) Adoption proceedings are a creature of statutory enactment, nonexistent at common law. (In re M.M., 156 Ill.2d at 62, 189 Ill.Dec. 1, 619 N.E.2d 702; Regenold v. Baby Fold, Inc. (1977), 68 Ill.2d 419, 436-37, 12 Ill.Dec. 151, 369 N.E.2d 858; see also 2 *1187 C.J.S. Adoption of Persons § 3 (1972).) The general rule of statutory interpretation which requires strict construction for actions or rights in derogation of the common law is inapplicable to actions under the Adoption Act as the Act itself provides that it "shall be liberally construed." (750 ILCS 50/20 (West 1992); see also In re Custody of Mitchell (1983), 115 Ill.App.3d 169, 70 Ill.Dec. 895, 450 N.E.2d 368.) As such, substantial compliance with the adoption laws is generally deemed sufficient. Cohen v. Janic (1965), 57 Ill.App.2d 309, 207 N.E.2d 89; Kathy O. v. Counseling and Family Services (1982), 107 Ill.App.3d 920, 63 Ill.Dec. 764, 438 N.E.2d 695.
The thrust of Angela's arguments on appeal is that her consent for adoption could not be transformed into a general surrender of her parental rights allowing DCFS to obtain custody of J.B. and authorize his adoption by individuals other than Z.S. In support of this contention, she points to the fact that section 10 of the Adoption Act sets forth two different forms. (750 ILCS 50/10 (West 1992).) The first, contained in subsection (A) is entitled "Final and Irrevocable Consent for Adoption." (750 ILCS 50/10(C) (West 1992).) The second, set forth in subsection (C) is entitled "Final and Irrevocable Surrender for Purposes of Adoption." 750 ILCS 50/10(C) (West 1992).
Ordinarily, the consent for adoption form is used in the context of a pending petition for adoption. (Johnson v. Burnett (1989), 182 Ill.App.3d 574, 131 Ill.Dec. 517, 538 N.E.2d 892 (requiring parental consent as a predicate to a proposed adoption then in process).) In contrast, a general surrender form is used in instances where the parent agrees to give up all parental rights to DCFS and authorizes that agency to consent to the child's future adoption. In re Custody of Mitchell, 115 Ill.App.3d at 172, 70 Ill.Dec. 895, 450 N.E.2d 368; see also In re Interest of Kerwood (1976), 44 Ill.App.3d 1040,1044, 3 Ill.Dec. 773, 359 N.E.2d 183 ("if there exists a petition presently seeking the adoption of the child, parental consent is expressed in writing in the form of a consent to adoption. [Citation] If a child is to be placed for adoption with a licensed agency with the right to consent to a future adoption, parental consent is expressed in writing in the form of a surrender.").
The problem presented by this case results from an attempt to use a consent to adoption form in a neglect proceeding where no petition to adopt was pending. Before the trial court below, Angela executed a document entitled "Final and Irrevocable Consent" which mirrors that contained in section 10(A) of the Adoption Act. The appellees contend that the trial court properly used this consent to adoption form as the basis for terminating Angela's parental rights. They argue that even though Angela never executed the appropriate surrender form, the context in which the consent form was executed, including the questions posed to her by the trial judge and her attorney and her answers to those questions, indicated that she was in fact surrendering J.B.
The rule is clear that a consent to adoption form is not interchangeable with a surrender of parental rights. See In re Custody of Mitchell (1983), 115 Ill.App.3d 169, 70 Ill.Dec. 895, 450 N.E.2d 368. In Mitchell, the natural father of a child executed a form substantially similar to the one executed by Angela in this case after his child had been placed in the custody of DCFS. At the time the father executed the consent, certain relatives were planning to adopt the child and those individuals were so named as petitioners in the caption of the document. (In re Custody of Mitchell, 115 Ill.App.3d at 171, 70 Ill.Dec. 895, 450 N.E.2d 368.) The contemplated adoption, however, never took place and DCFS again took custody of the child. Pursuant to a petition filed by DCFS, the child was subsequently determined to have been neglected and was made a ward of the court. A second petition was subsequently filed which sought to terminate the father's parental rights. The trial court granted that petition, finding that the father's previous consent to adopt was sufficient for that purpose. In re Custody of Mitchell, 115 Ill.App.3d at 171, 70 Ill.Dec. 895, 450 N.E.2d 368.
The question before the Mitchell court was the same as the one before us, "whether, by executing [a] document in compliance with the statutory provisions for adoption of a *1188 born child, the respondent also consented to the placement of [the child] with [DCFS] for subsequent adoption." (In re Custody of Mitchell, 115 Ill.App.3d at 172, 70 Ill.Dec. 895, 450 N.E.2d 368.) In reversing the trial court's ruling, the Mitchell court noted the differences between the consent to adoption form contained in subsection (A) of section 10 and the surrender of parental rights form found in subsection (C) of that section. The court stated that "[s]ection 10(A) contemplates the existence of a petition presently seeking the adoption of the child." (In re Custody of Mitchell, 115 Ill.App.3d at 172, 70 Ill.Dec. 895, 450 N.E.2d 368 citing In re Kerwood (1976), 44 Ill.App.3d 1040, [3 Ill.Dec. 773, 359 N.E.2d 183.) The court then contrasted that form with the function that a surrender form serves:
"[W]here `a child is to be placed for adoption with a licensed agency with the right to consent to a future adoption, parental consent is expressed in writing in the form of a surrender. [Citation.] These statutory forms are almost identical except that the consent form waives appearance in an actual ongoing adoption proceeding while the surrender form details `the transfer of all parental rights from the natural parents) to the agency, so that it may consent to an adoption occurring sometime in the future.' (Emphasis added.) (In re Kerwood, 44 Ill.App.3d 1040, 1044 [3 Ill.Dec. 773, 359 N.E.2d 183])" In re Custody of Mitchell, 115 Ill.App.3d at 172, 70 Ill.Dec. 895, 450 N.E.2d 368.
The Mitchell court concluded that there were substantial differences between the language of the two forms. (In re Custody of Mitchell, 115 Ill.App.3d at 172, 70 Ill.Dec. 895, 450 N.E.2d 368.) The primary difference being that the surrender form expressly provided for the surrender of a child to an agency "for the purpose of enabling it to care for and supervise the care of such child, to place such child for adoption and to consent to the legal adoption of such child." (In re Custody of Mitchell, 115 Ill.App.3d at 172, 70 Ill.Dec. 895, 450 N.E.2d 368.) This language is not contained in the consent to adoption form.
The Mitchell court further noted that the situation contemplated when the consent form was executed, the adoption of the child by specific known parties related to the father, was "considerably different" from "consenting to placement by an agency with persons unknown." (In re Custody of Mitchell, 115 Ill.App.3d at 172, 70 Ill.Dec. 895, 450 N.E.2d 368.) The Mitchell court consequently concluded that the consent to adoption form should not be "read * * * so broadly that it becomes an unconditional relinquishment of parental rights." In re Custody of Mitchell, 115 Ill.App.3d at 173, 70 Ill.Dec. 895, 450 N.E.2d 368.
The Mitchell decision has been followed by the appellate court in Nees v. Doan (1989), 185 Ill.App.3d 122, 133 Ill.Dec. 180, 540 N.E.2d 1046. There, the natural mother brought an action alleging that her consent to the adoption of her child became void after the trial court denied the prospective adoptive parents' petition for adoption and made her child a ward of the court. Like Angela, the natural mother in Nees alleged that her consent was void because it had been limited to the adoption of her child by the adoptive parents in question. Following Mitchell, the Nees court determined that the natural mother's consent for the adoption of her child by "specified known parties" could not be used as the basis for making the child a ward of the court and subsequently allowing adoption of that child by other individuals. (Nees v. Doan, 185 Ill.App.3d at 128, 133 Ill.Dec. 180, 540 N.E.2d 1046.) In so holding, the Nees court, like the Mitchell court, emphasized the difference between the consent to adoption form and the surrender form in that only the surrender form provided an agency with the power to place the child for adoption at its discretion. (Nees v. Doan, 185 Ill. App.3d at 128, 133 Ill.Dec. 180, 540 N.E.2d 1046; see also Johnson v. Burnett, 182 Ill. App.3d at 579-80, 131 Ill.Dec. 517, 538 N.E.2d 892 (following Mitchell and Nees in rejecting the argument that a section 10(A) consent to adoption signed by a natural parent could not be treated as a section 10(C) surrender); In re Kerwood, 44 Ill.App.3d at 1044, 3 Ill.Dec. 773, 359 N.E.2d 183.) It would therefore be inappropriate to treat *1189 Angela's consent to adoption as if it were a general surrender of parental rights.
The prospective adoptive parents contend as amicus curiae that Angela's arguments based on the differences between the consent to adoption form and the surrender form are "irrelevant and misleading" since only "substantial compliance" with the statutorily provided forms is required. This argument was rejected in Mitchell where the court stated:
"We do not think that the legislature, by providing different forms for different routes to adoption intended that no distinction be drawn between the different forms and that a consent to adoption be interchangeable with a surrender to an agency." In re Custody of Mitchell, 115 Ill. App.3d at 172-73, 70 Ill.Dec. 895, 450 N.E.2d 368.
See also Nees v. Doan where the court states that the language of section 10(A) cannot be:
"read so broadly that it encompasses a complete termination of parental rights where a proposed adoption by a specified known party is not consummated. In order for the statutory structure of section 10 to have any meaning, section 10(A) must be read to provide for irrevocable consent to a specific adoption only. Any other construction of section 10(A) would render it superfluous." See Nees v. Doan, 185 Ill.App.3d at 128, 133 Ill.Dec. 180, 540 N.E.2d 1046.
This is not a case where the form executed was only at slight variance with the statutory form. Rather, this is a case where an entirely different form used for an entirely different purpose was executed. Compare Kathy O. v. Counseling and Family Services, 107 Ill.App.3d at 925, 63 Ill.Dec. 764, 438 N.E.2d 695, which upheld a surrender where the form executed was a slightly modified version of the statutory form, with In re Custody of Mitchell and Nees v. Doan discussed above.
Appellees argue that In re Custody of Mitchell and Nees v. Doan are inapplicable as those cases did not involve a consent executed in the context of neglect proceedings. In this respect, the appellee argues that in cases of neglect, as opposed to adoption proceedings, the petition is brought in the name of the child and the proposed adoptive parents are not joined as parties to the proceedings. Although in this instance there may not have been an adoption petition pending by Z.S. when the consent was obtained, there is a substantial indication in the record that such adoption was expressly contemplated by Angela who expressly invoked that proposed adoption by Z.S. as the predicate for her consent. Moreover, there was no indication in any of the above mentioned cases that the type of proceeding in which the consent is initially executed was of any significance so long as it was apparent that the consent executed was intended for specific adoptive parents. (In re Custody of Mitchell, 115 Ill.App.3d at 172-73, 70 Ill.Dec. 895, 450 N.E.2d 368; Nees v. Doan, 185 Ill.App.3d at 128-29, 133 Ill.Dec. 180, 540 N.E.2d 1046.) These decisions emphasized that once a consent form was deployed it cannot arbitrarily be converted into a surrender form. Both Mitchell and Nees militate against the attempt to erode the integrity of each of these disparate forms.
For similar reasons, we reject the appellee's contention that this case is distinguishable from Mitchell because there, unlike here, the prospective adoptive parents were named in the caption of the consent. They would further contend that since no specific adoptive parents were designated, the consent signed was general and should apply to anyone.
The naming of the prospective adoptive parents in the caption of the consent to adoption form, however, is not a necessary prerequisite to a finding that the parent's consent was so limited. In fact, in Nees v. Doan the court found that the consent to adoption was intended for specific adoptive parents and thereby so limited even though those adoptive parents were not identified in the written consent. 185 Ill.App.3d at 128, 133 Ill.Dec. 180, 540 N.E.2d 1046.
As previously noted, there is a substantial indication in this case that Angela intended her consent to apply only to Z.S. even though no adoption petition by Z.S. was pending when the consent was signed. Angela's oral consent was expressly limited to and conditioned *1190 upon Z.S.'s adoption of J.B. During the hearing at which the consent was elicited, Angela expressly stated that she would voluntarily sign the consent "as long as [J.B.'s] placement is with [Z.S.]" When questioned later in the hearing by her attorney, Angela again expressly stated that it was her wish that Z.S. care for her children. Moreover, the relationship between the natural and adoptive parents in Nees was much more tenuous than the relationship between Angela and Z.S. Here, J.B. was to be adopted by his godmother who was caring for his older siblings. In contrast, the natural mother in Nees v. Doan had only briefly met the prospective adoptive parents. She did not conduct any investigation and had and only "some knowledge" of who they were. (Nees v. Doan, 185 Ill.App.3d at 128, 133 Ill.Dec. 180, 540 N.E.2d 1046.) Yet, the Nees court still determined that the natural mother's consent was restricted to them even though they were not identified in the consent form itself.
We are aware that an argument could be made that Angela's consent was expanded by her responses to questions from the trial judge and her attorney and her attorney's interchangeable use of the terms consent and surrender when conducting examination in these proceedings. However, that conclusion is not mandated, particularly in light of Angela's specific representations to the court that her consent was irrevocable as long as "placement was with Z.S." We cannot sanction a termination of parental rights based upon a purported indication of an expanded consent which is at best ambiguous and unclear.
Appellees contend that even if Angela's consent is determined to have been limited to Z.S. only, section 11 of the Adoption Act precludes her from bringing this action. Their argument is two-fold. First, DCFS contends that section 11 limits the grounds on which a consent or a surrender may be attacked to fraud or duress. Second, all appellees contend that the one year statute of limitations period contained in section 11 bars Angela's action because her motion to void the consent was filed approximately sixteen months after she signed the consent.
Section 11 of the Adoption Act provides:
"A consent to adoption by a parent, including a minor, executed and acknowledged in accordance with the provisions of Section 8 of this Act, or a surrender of a child by a parent, including a minor, to an agency for the purposes of adoption shall be irrevocable unless it shall have been obtained by fraud or duress on the part of the person before whom such consent, surrender, or other document equivalent to a surrender is acknowledged pursuant to the provisions of Section 10 of this Act or on the part of the adopting parents or their agents and a court of competent jurisdiction shall so find. No action to void or revoke a consent to or surrender for adoption, including an action based on fraud or duress, may be commenced after 12 months from the date the consent or surrender was executed. The consent or surrender of a parent who is a minor shall not be voidable because of such minority." 750 ILCS 50/11 (West 1992).
We first address DCFS's contention that section 11 acts as a per se bar to all actions which are based on grounds other than fraud or duress. Citing Cohen v. Janic (1965), 57 Ill.App.2d 309, 207 N.E.2d 89, and Kathy O. v. Counseling and Family Services (1982), 107 Ill.App.3d 920, 63 Ill.Dec. 764, 438 N.E.2d 695, DCFS contends that a court may not allow the withdrawal of a consent which does not allege fraud or duress in the obtaining of the consent. We disagree.
First, Cohen and Kathy O. do not limit section 11's applicability to actions based on fraud or duress; in fact Cohen expressly recognizes that actions may be based on the improper execution of a consent. Second, this argument is directly contrary to the results reached in In re Custody of Mitchell, Nees v. Doan, and Johnson v. Burnett. In these cases, the natural parents did not base their motion to vacate on fraud or duress, but rather on the fact that their consent to the adoption of their child was expressly limited to a specific individual and could not be used to authorize the adoption of a child by a different person. In re Custody of Mitchell, *1191 115 Ill.App.3d at 172-73, 70 Ill.Dec. 895, 450 N.E.2d 368; see also Nees v. Doan, 185 Ill.App.3d at 128-29, 133 Ill.Dec. 180, 540 N.E.2d 1046; Johnson v. Burnett, 182 Ill. App.3d at 579-80, 131 Ill.Dec. 517, 538 N.E.2d 892.
Moreover, contrary to DCFS's contentions, the language of section 11 does not limit actions seeking to void a consent to those based on fraud or duress. That section provides that "no action to void or revoke a consent to or surrender for adoption, including an action based on fraud or duress, may be commenced." (Emphasis added.) (750 ILCS 50/11 (West 1992.)) If this section only permitted fraud and duress actions as DCFS contends, either the initial "action to void or revoke a consent" language or the "including fraud and duress" language would be entirely superfluous. Furthermore, the use of the word "including" set off as a dependent clause, indicates that fraud and duress actions constitute only a portion of the actions which could be brought under the Act.
We next turn to the appellees' second contention, that Angela's action is barred by the one year statute of limitations set forth in section 11. Section 11 provides in pertinent part that "[n]o action to void or revoke a consent to or surrender for adoption, including an action based on fraud or duress, may be commenced after 12 months from the date the consent or surrender was executed." 750 ILCS 50/11 (West 1992).
Angela initially urges that this section only applies to actions based on fraud and duress and that it does not apply to actions based on the disruption of a proposed adoption. We reject this argument for the same reasons we rejected DCFS's argument that this section only sanctions actions to revoke consent based on fraud and consent. Section 11 contemplates actions to revoke consents based on grounds other than fraud and duress. It also clearly contemplates the application of its one year statute of limitations to such other actions.
Angela contends that once Z.S. decided not to adopt J.B., the consent which she signed offered no authority for any other subsequent adoption. She argues that in such an instance, the one year statute of limitations is inapplicable.
We disagree. The one year statute of limitations contained in section 11 has consistently been interpreted by courts as being absolute. On point is In re Adoption of Baby Girls Mandell (1991), 213 Ill.App.3d 670, 157 Ill.Dec. 290, 572 N.E.2d 359). There, the appellate court, noting the "clear and unequivocal language" of section 11, determined that section 11 barred actions to revoke consents filed more than one year after the signing of the consent, even where such consent is alleged to have been void ab initio. (In re Adoption of Baby Girls Mandell, 213 Ill.App.3d at 674, 157 Ill.Dec. 290, 572 N.E.2d 359.) The court rejected the parent's claim that she could attack a judgment of adoption as void because it was based on a consent which was likewise void. (In re Adoption of Baby Girls Mandell, 213 Ill.App.3d at 674, 157 Ill.Dec. 290, 572 N.E.2d 359.) The court stated:
"The heart of petitioner's position on appeal is that the judgment of adoption is void and may be attacked at any time. However, all of the petitioner's contentions in this regard are premised on her allegation that the consent to adoption was void. * * *. Petitioner's failure to attack the validity of the consent to adoption within this period is fatal to her attempt to attack the judgment, regardless of the means utilized If the consent cannot be challenged, then petitioner's arguments based on the invalidity of the consent must necessarily fail." (Emphasis added.) In re Adoption of Baby Girls Mandell, 213 Ill.App.3d at 674, 157 Ill.Dec. 290, 572 N.E.2d 359.
Similarly, Angela's argument is that the court was without authority to enter the order terminating her rights because the consent, although initially valid, became void when Z.S. decided not to adopt J.B. Assuming arguendo that this is the case, she cannot, however, challenge the consent now, or the order terminating her rights which was based on that consent, because she failed to bring her attack within one year of the signing of the consent. (In re Adoption of Baby Girls Mandell, 213 Ill.App.3d at 674, 157 Ill.Dec. 290, 572 N.E.2d 359.) Just as the *1192 petitioner in Mandell was prevented from challenging the allegedly void adoption based on the allegedly void consent, Angela is precluded from challenging both her consent which became void and the trial court's allegedly void order terminating her parental rights based on that consent. See also In re Jackson (1993), 243 Ill.App.3d 631, 183 Ill. Dec. 708, 611 N.E.2d 1356 (adopting the In re Adoption of Baby Girls Mandell interpretation of section 11 in barring a natural mother from challenging the validity of her surrenders because she did not do so within one year of executing those surrenders).
This absolute interpretation is consistent with this court's rejection of the "discovery rule" as it pertains to section 11. The discovery rule, generally provides that the relevant statute of limitations "starts to run when a person knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused." (Knox College v. Celotex Corp. (1981), 88 Ill.2d 407, 415, 58 Ill.Dec. 725, 430 N.E.2d 976.) In Street v. Hubert (1986), 141 Ill.App.3d 871, 96 Ill.Dec. 215, 491 N.E.2d 29, the appellate court refused to apply the discovery rule to section 11.
"We believe that the instant case is a prime example of where to permit the action would frustrate the purpose of the Adoption Act, which is to promote stable family relationships free from unnecessary intrusion. [Citation.] The 1982 amendment to the Act was designed to accomplish this objective by cutting off the prolonged ability of the natural parents to set aside an adoption decree. The legislature sought to eliminate this threat by shortening the period from five years under the general limitations statute to include the [1982] amendment to reduce the period to one year from the time the adoption decree was executed. If we accepted the plaintiff's position, allowing an action to set aside an adoption decree from the time of discovery of the fraud would in effect render adoption decrees vulnerable indefinitely to attack. This result would be inconsistent with the aims of the amendment and the overall purpose of the Act." Street v. Hubert, 141 Ill.App.3d at 874, 96 Ill.Dec. 215, 491 N.E.2d 29.
See also In re D.B (1993), 246 Ill.App.3d 484, 186 Ill.Dec. 279, 615 N.E.2d 1336 (following Street v. Hubert in rejecting the discovery rule, agreeing that its application would undermine the legislative purpose in enacting and subsequently amending section 11).
Angela cites In re Custody of Mitchell in support of her contention that her petition should not be considered timebarred. She points out that there the court allowed a successful action to revoke a consent more than one year after it was signed. That case, however, does not support Angela's position since no one asserted the limitations bar and it would therefore be waived. This is supported by the fact that there is no discussion in Mitchell of any time-bar contention. A statute of limitations is an affirmative defense which must be raised by a party before a court will apply it to bar a party's action. (Boonstra v. City of Chicago (1991), 214 Ill.App.3d 379, 158 Ill.Dec. 576, 574 N.E.2d 689.) It would be unwise to rely on Mitchell as Angela contends.
We note that in interpreting the statute of limitations in section 11 as absolute and in rejecting the application of the discovery rule, courts have consistently based their decision in large part on the legislature's intent to promote the finality and stability of adoptions. (In re Adoption of Baby Girls Mandell, 213 Ill.App.3d at 674, 157 Ill.Dec. 290, 572 N.E.2d 359; Street v. Hubert, 141 Ill. App.3d at 874, 96 Ill.Dec. 215, 491 N.E.2d 29.) We likewise recognize the legislature's apparent desire to enact a rigid statute of limitations which requires strict adherence. In addition to the cases cited above, the Illinois Supreme Court in Regenold v. Baby Fold, Inc. (1977), 68 Ill.2d 419, 12 Ill.Dec. 151, 369 N.E.2d 858, noted that limited revocability furthered the public policy of promoting stability in the adoption proceedings and protecting the welfare of the children involved. In so stating, the Regenold court noted that this policy determination was "peculiarly within the competence of the [legislature] and the judiciary should not attempt to alter or abrogate that clearly expressed legislative determination." Regenold v. Baby *1193 Fold, Inc., 68 Ill.2d at 440, 12 Ill.Dec. 151, 369 N.E.2d 858; see also In re Nolan (1981), 94 Ill.App.3d 1081, 50 Ill.Dec. 442, 419 N.E.2d 550.
Angela argues that the public policy favoring the finality and stability of adoptions is not at issue here because there has been no final adoption of J.B. She asserts that consequently there is no corresponding reason, either on the behalf of J.B. or his prospective adoptive parents, to refuse to grant her the relief she seeks.
A final adoption, however, is not a prerequisite to the application of the statute of limitations contained in section 11. On point is In re D.B. (1993), 246 Ill.App.3d 484, 186 Ill.Dec. 279, 615 N.E.2d 1336. There, a mother attempted to challenge the surrender she executed more than one year after she signed it. In so doing, she pointed out that there was no final order of adoption. The court rejected this argument, stating
"There is a factual distinction between challenging the validity of the surrender for adoption and challenging a final order of adoption. [Citation.] However, [section 11] is addressed to the subject of challenges to the validity of the surrender for adoption, without any reference to whether an order of adoption has been entered. The statute specifically bars a challenge to the validity of the surrender made later than 12 months after the date on which the document was signed." In re D.B., 246 Ill.App.3d at 490, 186 Ill.Dec. 279, 615 N.E.2d 1336.
Moreover, although the adoption of J.B. is not final yet, he has spent a significant amount of time with his prospective adoptive parents. The public policy favoring stability in the life of the adopted child would also favor stability in a case such as this one where the child has been living with his prospective adoptive parents for over one year, while awaiting the completion of the adoption process.
Angela argues that even if section 11's statute of limitations governs this situation, the doctrine of equitable estoppel as articulated in Witherell v. Weimer (1981), 85 Ill.2d 146, 52 Ill.Dec. 6, 421 N.E.2d 869, would preclude the application of that statute of limitations against her to bar her motion to void her consent. Specifically, Angela contends that she contacted Hampton about reestablishing her paternal rights in April 1992 when she discovered that J.B. had been removed from Z.S.'s home. Angela claims that she took no formal action to revoke her consent at that time because she believed and relied on Hampton's misrepresentations that the case was no longer in the court system and that her parental rights could not be regained.
DCFS first argues that the doctrine of equitable estoppel does not apply to section 11. Citing the decision of the Seventh Circuit in Smith v. City of Chicago Heights (7th Cir.1992), 951 F.2d 834, DCFS contends that section 11's statute of limitations is jurisdictional because adoption proceedings and consents are solely the creation of statute. DCFS asserts that because the statute of limitations is jurisdictional it can not be equitably extended and that any motions filed after the expiration of the limitations period must be barred.
In determining whether a statute of limitations is jurisdictional or procedural courts look to the right being asserted. (Smith v. City of Chicago Heights, 951 F.2d at 838-39.) "[I]f the right being asserted is one unknown to the common law, the time limitation is an inherent element of the right and of the power of the tribunal to hear the matter." (Charleston Community Unit School District No. 1 v. Illinois Educational Labor Relations Board (1990), 203 Ill.App.3d 619, 623,149 Ill.Dec. 53, 561 N.E.2d 331.) In contrast, a statute of limitations will be considered procedural, and capable of being equitably extended, when "the right upon the request for relief is based is a common law right." Charleston Community Unit School District No. 1 v. Illinois Educational Labor Relations Board, 203 Ill.App.3d at 623, 149 Ill.Dec. 53, 561 N.E.2d 331.
In asserting that the statute of limitations in section 11 is jurisdictional, DCFS urges that adoption proceedings and consents were unknown at common law and are solely creatures of statute. However, to determine *1194 whether the limitations period is jurisdictional, the focus should not be on the act or event being challenged, but rather on whether the "right upon which the request for relief is based" existed under common law. (Charleston Community Unit School District No. 1 v. Illinois Educational Labor Relations Board, 203 Ill.App.3d at 623, 149 Ill.Dec. 53, 561 N.E.2d 331.) Here, the right on which Angela's request for relief is based is the common law right of a mother to have custody and rear her child. (See, e.g., Smith v. Organization of Foster Families for Equality and Reform (1977), 431 U.S. 816, 845, 97 S.Ct. 2094, 2110, 53 L.Ed.2d 14, 36 ("the liberty interest in family privacy has its source, and its contours are ordinarily to be sought, not in state law, but in intrinsic human rights").) Moreover, a determination that the statute of limitations is jurisdictional would not necessarily preclude the application of the doctrine of equitable estoppel under Illinois law. See Faulkner-King v. Department of Human Rights (1992), 225 Ill.App.3d 784, 167 Ill.Dec. 330, 587 N.E.2d 599, and Lee v. Human Rights Comm'n (1984), 126 Ill.App.3d 666, 81 Ill.Dec. 821, 467 N.E.2d 943 (applying the doctrine of equitable estoppel to preclude the application of a statute of limitations even if such limitation is jurisdictional).
Appellees urge that Angela's estoppel argument is just "simply another name for the discovery rule" which was rejected by this court in Street v. Hubert and In re D.B. We disagree. While the same policy reasons for rejecting the discovery rule, i.e. the finality of adoptions, could arguably support the rejection of the doctrine of equitable estoppel, the discovery rule is a form of equitable tolling and its applicability, or lack thereof, does not preclude the application of the independent doctrine of equitable estoppel. The Seventh Circuit explained the differences between these two independent doctrines in Bomba v. W.L. Belvidere, Inc. (7th Cir.1978), 579 F.2d 1067, where it stated:
"Tolling, strictly speaking, is concerned with the point at which the limitations period begins to run and with the circumstances in which the running of the limitations period may be suspended. These are matters in large measure governed by the language of the statute of limitations itself. * * *. Equitable estoppel, however, is a different matter. It is not concerned with the running and suspension of the limitations period, but rather comes into play only after the limitations period has run and addresses itself to the circumstances in which a party will be estopped from asserting the statute of limitations as a defense because his conduct has induced another into forebearing suit within the applicable limitations period. Its application is wholly independent of the limitations period itself and takes its life, not from the language of the statute, but from the equitable principal that no man will be permitted to profit from his own wrongdoing in a court of justice. Thus, because equitable estoppel operates directly on the defendant without abrogating the running of the limitations period as provided by statute, it might apply no matter how unequivocally the applicable limitations period is expressed." Bomba v. W.L. Belvidere, Inc., 579 F.2d at 1070.
This cogent analysis sets forth the primary differences in the application of these independent doctrines. The discovery rule focuses on when the plaintiff learned of the cause of action, rather than why plaintiff failed to file suit within the limitations period. More importantly, unlike the discovery rule, the doctrine of equitable estoppel focuses on the conduct of the opposing party since it is designed to prevent that party from benefitting from its own wrongs. (In re Custody of D.A. (1990), 201 Ill.App.3d 810, 146 Ill.Dec. 1021, 558 N.E.2d 1355.) Thus, we cannot assume that rejection of the discovery rule would automatically require rejection of the doctrine of equitable estoppel.
A party can invoke the doctrine of equitable estoppel when she reasonably relies on another party's conduct or representations in forebearing suit. (In re Custody of D.A., 201 Ill.App.3d at 820, 146 Ill.Dec. 1021, 558 N.E.2d 1355; see also Kapp v. Alexander (1991), 218 Ill.App.3d 412, 161 Ill.Dec. 158, 578 N.E.2d 285.) Intentional deception on the part of defendant need not be present. (Lissner v. Michael Reese Hospital (1989), *1195 182 Ill.App.3d 196, 130 Ill.Dec. 673, 537 N.E.2d 1002.) In order to support the application of the doctrine of equitable estoppel, the party asserting the estoppel must prove the "requisite elements by `clear, precise and unequivocal' evidence." Feiler v. Covenant Medical Center (1992), 232 Ill.App.3d 1088, 1093, 174 Ill.Dec. 179, 598 N.E.2d 376 quoting Central Transport, Inc. v. Village of Hillside (1991), 210 Ill.App.3d 499, 154 Ill.Dec. 910, 568 N.E.2d 1359.
The type of conduct which gives rise to an estoppel is generally a question of fact. (Feiler v. Covenant Medical Center, 232 Ill. App.3d at 1093, 174 Ill.Dec. 179, 598 N.E.2d 376; Kapp v. Alexander, 218 Ill.App.3d at 417-18, 161 Ill.Dec. 158, 578 N.E.2d 285; 51 Am.Jur.2d Limitation of Actions § 438 at 903 (1970).) As such, a court of review will not reverse a trial court's decision on the issue of estoppel unless it is against the manifest weight of the evidence. Feiler v. Covenant Medical Center, 232 Ill.App.3d at 1093, 174 Ill.Dec. 179, 598 N.E.2d 376.
Courts have consistently determined that to warrant the application of the doctrine of equitable estoppel to bar defendant from asserting the statute of limitations as a defense, the plaintiff would have had to also demonstrate that she "`had no knowledge or convenient means of knowing the true facts.'" Neaterour v. Holt (1989), 188 Ill. App.3d 741, 750, 136 Ill.Dec. 160, 544 N.E.2d 846 (quoting Pantle v. Industrial Comm'n (1975), 61 Ill.2d 365, 371, 335 N.E.2d 491; Lissner v. Michael Reese Hospital & Medical Center, 182 Ill.App.3d at 207-08, 130 Ill. Dec. 673, 537 N.E.2d 1002.
In this case, there were apparent alternate methods of ascertaining the truth. Angela could have easily sought the advice of an attorney for a determination as to whether she could regain her rights. She could have called the public defender who represented her at the July 12,1991, hearing or any other attorney for that matter once she learned that Z.S. was not going to adopt J.B. in April 1992. (See Pack v. Santa Fe Park Enterprises, Inc. (1991), 209 Ill.App.3d 648, 653, 154 Ill.Dec. 360, 568 N.E.2d 360 (plaintiff's reliance on defendant's letter stating incorrect date of plaintiff's injury did not support application of the doctrine of equitable estoppel; "plaintiff had ample means of ascertaining the precise date of her injury, without regard to the date of the injury stated in correspondence from [defendant]").) Angela admitted that Hampton did not tell her not to contact an attorney; nor did DCFS attempt to restrict any avenues to competent legal advice that Angela possessed. Angela's assertion that her blind reliance on the legal advice of Hampton, a non-attorney, in the face of more reliable alternative avenues of information will not find protection under the doctrine of equitable estoppel as "`a party claiming the benefit of an estoppel cannot shut h[er] eyes to obvious facts, or neglect to seek information that is easily accessible, and then charge h[er] ignorance to others.'" (Emphasis added.) Pack v. Santa Fe Park Enterprises, Inc., 209 Ill.App.3d at 652, 154 Ill.Dec. 360, 568 N.E.2d 360 quoting Vaughn v. Speaker (1988), 126 Ill.2d 150, 169, 127 Ill.Dec. 803, 533 N.E.2d 885 (Ryan, J., specially concurring); see also Neaterour v. Holt, 188 Ill.App.3d at 749-50, 136 Ill.Dec. 160, 544 N.E.2d 846; Gary-Wheaton Bank v. Burt (1982), 104 Ill.App.3d 767, 60 Ill.Dec. 518, 433 N.E.2d 315.
We also note that when Angela learned that Z.S. was not going to adopt J.B., there was still approximately three months left before the limitations period expired. This would have left sufficient time for her to contact an attorney and file her petition before the statute of limitations period expired. See Neaterour v. Holt, 188 Ill.App.3d at 750, 136 Ill.Dec. 160, 544 N.E.2d 846 (application of doctrine of equitable estoppel to excuse failure to file claim within statute of limitations was rejected where plaintiff admitted having some independent knowledge of the facts and had time to file suit with the limitations period); cf. In re Custody of D.A., 201 Ill.App.3d at 821, 146 Ill.Dec. 1021, 558 N.E.2d 1355 (father's petition to establish paternity rights was barred by the statute of limitations contained in the Illinois Parentage Act where his delay in filing that petition was not reasonable; regardless of mother's earlier representations that he was child's father, he "was free to initiate an action whereby he could obtain legal recognition of his rights as *1196 [a] father"); In re Adoption of Lori Gay W. (Okla.1978), 589 P.2d 217 (petition of parent to vacate adoption on basis that her consent was procured through fraud was time barred by one year statute of limitations when parent waited one year and eight months after learning of fraud to file that petition).
Moreover, the misrepresentation in this case did not consist of a series of constant reassurances which were designed to lull Angela into inaction. Rather Hampton's misrepresentation consisted of a single statement made in response to Angela's inquiry. (See Faulkner-King v. Department of Human Rights, 225 Ill.App.3d at 793, 167 Ill. Dec. 330, 587 N.E.2d 599.) This is distinguishable from the repeated constant reassurances which were present in Witherell Cf. Lissner v. Michael Reese Hospital & Medical Center, 182 Ill.App.3d at 204-05, 130 Ill. Dec. 673, 537 N.E.2d 1002.
We note further that Hampton's representation did not attempt to lull Angela with false assurances that DCFS would correct the situation on its own initiative. (See Tomes v. Chrysler Corp. (1978), 60 Ill.App.3d 707, 711, 18 Ill.Dec. 71, 377 N.E.2d 224 (fact that parties were negotiating settlement "does not show that defendant engaged in a course of conduct calculated to lull plaintiff into a reasonable belief that the case would be settled without suit and that the defense of statute of limitations would not be asserted").) Rather, Hampton merely purported to assert an incorrect legal opinion that Angela was without recourse. In essence, Hampton's representation constituted an opinion on a matter of law, i.e., the viability of Angela's right to revoke her consent. A representation on a matter of law will ordinarily be insufficient to support the basis of an estoppel.
"The well-recognized rule is that a representation as to a matter of law will not ordinarily support an action for fraud or deceit, nor constitute an estoppel to rely upon the statute of limitations, the reason for the rule being that representations as to matters of law are ordinarily considered as expressions of opinion, and justifiable reliance cannot be had upon the mere opinion of another." 51 Am.Jur.2d Limitation of Actions § 451 at 913 (1970).
See, e.g., Barton v. Peterson (N.D.Ga.1990), 733 F.Supp. 1482, 1492 (plaintiff's reliance on statements made by defendant and defendant's counsel could not form the basis of an estoppel to preclude the imposition of a statute of limitations where such alleged misrepresentation only constituted a "bad opinion" on whether misappropriated funds would be returned to investors); Barnett v. Getty Oil Co. (Miss.1972), 266 So.2d 581, 587 ("[i]n order for a representation to be the basis of an estoppel it must amount to a representation of material fact as opposed to a representation made as to a matter of law"); Gabovitz v. State Auto Insurance Association (1987), 362 Pa.Super. 17, 523 A.2d 403.
In rejecting Angela's equitable estoppel claim, we also agree with appellees' contention that we should hesitate to permit the application of the doctrine of equitable estoppel against the State or a public body. Although the doctrine of equitable estoppel can be asserted against the State, courts do not generally favor a finding of estoppel against a public body. (See Feiler v. Covenant Medical Center, 232 Ill.App.3d at 1093, 174 Ill.Dec. 179, 598 N.E.2d 376 (stating that municipality should not be precluded by the doctrine of equitable estoppel from asserting statute of limitations absent "`compelling circumstances,' such as where not invoking estoppel would defeat the operation of the policy").) In light of this policy and the aforementioned infirmities, we would be reluctant to apply the doctrine in this instance.
Angela's final argument is that the order terminating her parental rights is void because she was not served with summons or otherwise notified of the supplemental petition to terminate her parental rights filed by DCFS. Angela argues that such failure deprived the trial court of jurisdiction over the matter and rendered the trial court's subsequent orders void.
We need not, however, address Angela's final assertion that the failure to serve fresh summons on her for DCFS' supplemental petition or its failure to otherwise notify her of that hearing deprived the trial court of jurisdiction. Nor must we decide whether *1197 Angela waived any right to such further summons or notice by signing the consent form when such form specifically provided that "I hereby enter my appearance in this proceeding and waive service of summons upon me." Regardless of our determination of these issues, Angela's attack on her consent, whether such attack is jurisdictional or on the merits, would be barred by section 11's statute of limitations. See In re Adoption of Baby Girls Mandell, 213 Ill.App.3d at 674, 157 Ill.Dec. 290, 572 N.E.2d 359 (all of petitioner's challenges that her consent was void were barred by section 11's statute of limitations, including her jurisdictional argument); cf In re Jackson, 243 Ill.App.3d at 650, 183 Ill.Dec. 708, 611 N.E.2d 1356 ("[a]ny contentions based upon the invalidity of those surrenders were * * * barred").
We also note Angela has failed to convincingly demonstrate how her absence from the termination hearing on August 13, 1992, adversely affected her. Since the August 1992 hearing took place more than one year after the consent was signed, she would have been under the same procedural constraint had she appeared then instead of at the May 14, 1993, hearing. She was also given the opportunity to present evidence as to her equitable estoppel claim at that May 14, 1993, hearing. See In re Shawn B. (1991), 218 Ill.App.3d 374, 161 Ill.Dec. 142, 578 N.E.2d 269 (juvenile who subsequently appeared in court with counsel on adjudication of original petition for adjudication of wardship was not substantially prejudiced by State's failure to serve him with notice of supplemental petition seeking to terminate State's guardianship).
The appellees have urged that Angela should be precluded from blocking the prospective adoption by reason of the "best interests of the child" standard. Although our decision allows the adoption of J.B. by his current foster family to proceed, we disagree that this result could have been accomplished solely by applying the "best interests of the child standard."
First, although section 20a of the Adoption Act does provide that the "best interests and welfare of the person to be adopted shall be the paramount consideration in the construction and interpretation of this Act" (750 ILCS 50/20a (West 1992)), that section does not sanction the use of an individualized best interest analysis in each case under the guise of interpreting the Act to achieve results based solely on the circumstances of the parties in that particular case. Under such an application, section 20a would be interpreted to connote opposite results depending upon the socio-psychological dynamics of a given situation.
It is well established that the best interests of the child will not provide an independent basis to license State action to remove a child from a parent's custody without an adjudication determining parental neglect or unfitness. (Culkin v. Culkin (1975), 30 Ill. App.3d 1073, 333 N.E.2d 698.) As such, a child's best interests cannot be addressed unless a parent is first determined to be unfit. As our Supreme Court stated in In re Adoption of Syck (1990), 138 Ill.2d 255, 276-77, 149 Ill.Dec. 710, 562 N.E.2d 174.
"When ruling on parental unfitness, a court is not to consider the child's `best interest.' [Citation.] `Where the rights and interests of a parent are sought to be permanently severed, the best interests of the child can be considered only if the court finds by clear and convincing evidence that the parent is unfit or consents to the severance.' * * *. Only after a parent is found, by clear and convincing evidence, to be unfit does a circuit court ruling on an adoption petition proceed to consider the child's best interest and whether those interests would be served by the child's adoption by the petitioners, requiring termination of the natural parent's parental rights."
See also In re Adoption of Burton (1976), 43 Ill.App.3d 294, 1 Ill.Dec. 946, 356 N.E.2d 1279.
The custody cases which speak of a child's best interests and the rights of the parents cited by the appellees, In re Ashley K. (1991), 212 Ill.App.3d 849, 156 Ill.Dec. 925, 571 N.E.2d 905, and In re Violetta B. (1991), 210 Ill.App.3d 521, 154 Ill.Dec. 896, 568 N.E.2d 1345, are distinguishable in that those cases involve custody proceedings which are governed by the best interests standard. Those cases do not involve the *1198 legal validity of a consent to adoption executed by a child's parent or the termination of that parent's rights pursuant to that consent. Moreover, those cases in no way sanction the use of a best interests standard to override the statutory scheme and terminate the parental rights of a natural parent based solely on the best interests of the child. Thus, our decision in this case stands on the reasons previously discussed, rather than the application of the "best interests of the child standard."
For the foregoing reasons, the judgment of the circuit court is affirmed.
JUDGMENT AFFIRMED.
McNULTY and COUSINS, JJ. concur.