# Illinois Official Reports

## Appellate Court

> *In re Marriage of Mancine*, 2014 IL App (1st) 111138-B

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF MIKI LOVELAND MANCINE, Petitioner-Appellee, and NICHOLAS F. GANSNER, Respondent-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-1138 |
| Filed | March 31, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In marriage dissolution proceedings where petitioner had adopted a child as a single parent prior to the marriage and respondent never sought to adopt that child after the marriage but did seek custody after the marriage was dissolved, and the appellate court affirmed the trial court's dismissal of his attempt to obtain custody on the ground that he lacked standing, but the supreme court directed the appellate court to vacate its decision and reconsider the matter in light of the supreme court's decision in *DeHart* recognizing equitable adoption in a probate proceeding, the appellate court stood by its original decision after concluding that although equitable adoption is applicable in probate cases, it should not apply in adoption, divorce, or parentage actions, especially when the statutes governing those proceedings clearly establish parental rights, who is a parent and how parentage is established through adoption; furthermore, equitable adoption is not recognized in Illinois in custody proceedings, and in the absence of a contract in the instant case, there was no basis for invoking the "contract to adopt theory," and the *parens patriae* power under the Juvenile Court Act did not apply. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-D-9394; the Hon. Nancy J. Katz, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Andrew D. Eichner and Myra A. Foutris, both of Berger Schatz, of Chicago, for appellant. |
|---|---|
| | Enrico J. Mirabelli and Amy L. Jonaitis, both of Beermann, Pritikin, Mirabelli & Swerdlove, LLP, of Chicago, for appellee. |
| Panel | JUSTICE PUCINSKI delivered the judgment of the court, with opinion. |
| | Justices Fitzgerald Smith concurred in the judgment and opinion. |
| | Justice Mason[*] specially concurred, with opinion. |

## OPINION

¶ 1     In divorce proceedings below, the husband, respondent Nicholas Gansner, sought custody of a minor child, William Gansner. William had been adopted by only the mother, petitioner Miki Loveland Mancine. The child was not the biological child of either Miki or Nicholas. Nicholas knew at all times that filing a petition to adopt was necessary and was aware that he simply had to provide a form petition and include a copy of Miki's adoption order. The couple adopted another child, and Nicholas filed a petition for that child and became that other child's parent. Yet Nicholas never filed a petition to adopt or even began adoption proceedings for William. Miki then filed for divorce. Nicholas sought custody of William. The circuit court granted Miki's motion to dismiss on the grounds that Nicholas lacked standing. In our previous opinion, we affirmed the dismissal because: (1) Illinois had not recognized "equitable adoption" in child custody proceedings and a "contract to adopt" theory did not apply where there was no contract; (2) equitable estoppel did not apply to bar a finding that Nicholas was not a parent due to Miki's holding out of him as the parent, where the husband was aware at all times that William was not his biological child and that formal adoption was necessary; (3) Illinois also has not adopted the "equitable parent" doctrine in any context and Nicholas has no standing as a parent to seek custody under the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/101 *et seq.* (West 2010)), the Illinois Parentage Act (750 ILCS 40/1 *et seq.* (West 2010)), or the Illinois Parentage Act of 1984 (750 ILCS 45/1 *et seq.* (West 2010)); (4) there was no basis to invoke the *parens patriae* power under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2010)); and (5) Miki legally adopted the child as a single person and there is no requirement that the child must be adjudicated to have a father. *In re Marriage of Mancine*, 2012 IL App (1st) 111138.

---

[*]Pursuant to Justice Sterba's retirement, Justice Mason has participated in the reconsideration of this case. Justice Mason has reviewed all relevant materials, including the court's opinion filed on February 2, 2012, and the supervisory order issued by our supreme court.

¶ 2    After our opinion, the Illinois Supreme Court rendered a decision in *DeHart v. DeHart*, 2013 IL 114137, recognizing equitable adoption in the context of an adult seeking inheritance in a probate proceeding. After the decision in *DeHart*, we received a supervisory order from the Illinois Supreme Court directing us to vacate our prior opinion and instructing us to reconsider our decision in light of *DeHart* to determine if a different result was warranted. *In re Marriage of Mancine*, No. 113978 (Ill. May 29, 2013) (supervisory order). We hereby vacate our prior opinion and substitute this opinion, determining that *DeHart* does not warrant a different result from our prior decision, because equitable adoption is a concept in probate to determine inheritance and should have no application in the context of statutory proceedings of adoption, divorce proceedings, or parentage, and also because the facts of this case are vastly different from *DeHart* and do not meet the adopted standards in *DeHart* to establish an equitable adoption. Our statutes concerning adoption, parentage, and divorce are clear concerning who is a parent, how a person may become a parent through adoption, and what a parent's rights are. Nicholas was well aware of the adoption requirements and chose not to pursue them. Further, Miki is the legal parent of William and to recognize Nicholas as having "equitably adopted" William would violate Miki's constitutional right to raise her children. To apply the concept of equitable adoption in the context of our statutory proceedings of adoption, parentage and divorce would undermine the entire family law structure enacted by our legislature and create uncertainty and protracted litigation.

¶ 3                                    BACKGROUND

¶ 4    The facts of this case remain the same as our prior opinion and we restate them: Miki and Nicholas began dating in the spring of 2008. At that time, Miki was separated from her then-husband, John Mancine. Miki had a one-year-old adopted daughter named Elizabeth and had begun the process of adopting a second child, William, and was matched with a birth mother. Miki and Nicholas decided they would marry in approximately June or July of 2008. Because Miki had already started the adoption process of William as a single parent before she met Nicholas, Miki and Nicholas were advised by the adoption agent to finish the process of Miki's adoption of William, and then for Nicholas to adopt William as a stepparent after the parties' marriage. At the time, Miki and Nicholas resided in Wisconsin, where unmarried couples cannot simultaneously adopt a child. See Wis. Stat. Ann. § 48.82 (West 2008).

¶ 5    William was born on August 5, 2008, and his birth certificate reflected the name "William Michael Gansner." In early September 2008, the adoption agent visited Miki and Nicholas to update the home study completed in January 2008 because Nicholas had moved in with Miki and was co-parenting William. Miki's adoption of William was not yet finalized due to the six-month statutory waiting period. In the adoption agent's report of February 27, 2009, the agent noted that Miki named Nicholas as the sole guardian of William and any future child she has, and named her parents as alternate guardians. Nicholas took care of William, including diaper changes and feedings. On November 2, 2008, William was baptized. The church record for the baptism listed William's "parents" as Nicholas and Miki. Nicholas and Miki became formally engaged in December 2008.

¶ 6    Miki's adoption of William as a single adult was finalized in Wisconsin on March 4, 2009. The adoption papers identified William as "William Michael Gansner." Nicholas and Miki got married in May 2009. It was both Nicholas's and Miki's intent that Nicholas formally adopt William as a stepparent after their wedding. Miki had contacted William's adoption agent

before their wedding and arranged for her to visit them immediately following the wedding to perform a screening for Nicholas's adoption of William. In June 2009 the adoption agent performed the stepparent adoption screening of Nicholas. The agent's report of June 9, 2009, reflected that the adoption agency intended to support the granting of Nicholas's stepparent adoption petition. In Nicholas's affidavit in support of his pleadings, he attached an e-mail from the adoption agent to Nicholas dated August 6, 2010, informing Nicholas that he was free to file his stepparent adoption petition, and he averred that this is a true and correct copy of the e-mail.

¶ 7 At that time, Nicholas and Miki had already started the process of adopting yet another child, Henry, and were in the process of moving from Wisconsin to Chicago, Illinois, to be closer to Miki's parents. The parties completed their adoption of Henry, with both Miki and Nicholas as adoptive parents. Nicholas alleges that he was under the impression that he and Miki had to assemble a number of documents to accompany his adoption petition for William. Later, however, Nicholas learned that he simply had to provide a form petition and include a copy of the order of Miki's adoption of William. Nicholas alleges in his brief that "[a]s a result of all of these factors, the ministerial act of filing the stepparent adoption papers just never happened." Nicholas averred in his affidavit that on August 6, 2009, Miki e-mailed him asking, "Have you made any progress toward adopting William???? I would like you to take care of that ASAP," and telling Nicholas to "call Carol Gapen from law center for children and families." It is undisputed that Nicholas never filed a petition to adopt William.

¶ 8 Nicholas and Miki moved to Chicago with Elizabeth and William. Henry was born on September 16, 2009. Nicholas alleges that since he was out of work and Miki was traveling for her job, he was the primary caretaker of the three children. Nicholas is an attorney and eventually became employed in a full-time position as an assistant Attorney General for the State of Illinois. Nicholas maintains he continued to act as the three children's primary caretaker and took Elizabeth and William to day care and Henry to Miki's parents' house every morning. In the evenings, Miki's mother and a nanny would pick up the children from day care and bring them home to be with Nicholas. Nicholas was listed as the children's parent at their day care facility. According to Nicholas, Miki always held out William as Nicholas's child and held out herself, Nicholas, Elizabeth, William and Henry as "the Gansner family." It is undisputed that, at this time, Nicholas still had not undertaken any action to adopt William.

¶ 9 Miki filed a petition for dissolution of marriage and served Nicholas with summons for dissolution of marriage on September 24, 2010. In Miki's petition, she alleged that she and Nicholas had only one child, Henry, and that Nicholas was a fit and proper person to share joint custody of Henry. On December 6, 2010, Nicholas filed his response to Miki's petition for dissolution of marriage and his counterpetition for dissolution of marriage. In both pleadings, Nicholas sought sole custody of both William and Henry. On December 16, 2010, Miki filed her motions to dismiss Nicholas's claim for sole custody of William in his response and counter-petition, pursuant to section 2-619(a)(9) of the Illinois Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2010)), based on the fact that William had no standing to seek custody of William. On March 14, 2011, the circuit court issued its ruling granting Miki's motions to dismiss, followed by a written order. Nicholas timely appealed. We rendered a published opinion but later received a supervisory order to vacate that opinion and reconsider our decision in light of *DeHart*.

¶ 10                                       ANALYSIS

¶ 11        The issue in this case remains whether Nicholas has standing to seek custody of William. The court below granted Miki's section 2-619 motion to dismiss Nicholas's request for custody based on his lack of standing due to the fact that he never became a parent because he never adopted William. "Standing in Illinois requires 'some injury in fact to a legally cognizable interest.' " *Preferred Personnel Services, Inc. v. Meltzer, Purtill & Stelle*, *LLC*, 387 Ill. App. 3d 933, 938 (2009) (quoting *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 492 (1988)). The issue now presented by this case, after the *DeHart* decision and the Illinois Supreme Court's supervisory order to us, is whether the equitable adoption concept recognized in *DeHart* should be applied in the present case to give Nicholas standing as a parent to seek custody or visitation of William. We allowed the parties further briefing to argue their positions on the issue. Where the facts in a case are uncontroverted, we review a trial court's order granting a section 2-619 motion to dismiss (735 ILCS 5/2-619 (West 2010)) *de novo*. *Boelkes v. Harlem Consolidated School District No. 122*, 363 Ill. App. 3d 551, 554 (2006). Also, generally the question of standing is reviewed *de novo*. *In re Guardianship of K.R.J.*, 405 Ill. App. 3d 527, 535 (2010).

¶ 12        We first address the "equitable adoption" doctrine and find Nicholas's arguments are not well grounded and that this case is vastly different from *DeHart* both factually and legally. We further hold that equitable adoption was recognized in *DeHart* for an adult seeking inheritance in a probate proceeding, and it has no application in the statutory proceedings of adoption, divorce, and parentage. Because we hold equitable adoption does not apply in this case, we reiterate our prior discussion and disposition of the parties' remaining alternate arguments in their original briefs on appeal concerning equitable estoppel, the "equitable parent" doctrine, and *parens patriae*. We again affirm the circuit court's dismissal.

¶ 13                                  I. "Equitable Adoption"

¶ 14        A review of the facts in *DeHart* leads us to readily conclude that "equitable adoption" should not be applied in the context of our family law statutes, nor specifically in this case, to confer standing on Nicholas as a parent. *DeHart* was a common-law action against the executor of the estate of the decedent, Donald DeHart, to contest the decedent's will. In *DeHart*, the plaintiff, James DeHart, was held out to be the son of Donald for James's entire life, more than 60 years, until Donald's death. James's natural mother had agreed with Donald that Donald would adopt James and this agreement was kept a secret for the good of the family. *DeHart*, 2013 IL 114137, ¶ 5. Donald had pursued a legal adoption, hired an attorney, received a birth certificate naming him as James's father, and believed the adoption had been formalized and was legal. *Id.* ¶ 3. Eventually James learned that he was not the biological son of Donald when he applied for a passport and obtained his original birth certificate. *Id.* ¶ 4. Donald continued holding James out as his son and drafted a will leaving him an inheritance (*id.* ¶ 7), but the adoption was never formalized (*id.* ¶ 6). A year later, James's natural mother died (*id.*) and Donald remarried four years later (*id.* ¶ 8). Donald's new wife purportedly exerted undue influence on Donald when he was not of sound mind to revise his will to leave no inheritance to James, stating that Donald had no children. *Id.* ¶ 11. When Donald died, his new wife was the executor of his estate and filed the second will in the circuit court of Will County. *Id.* ¶ 12. James filed the suit to contest that will on grounds of testator incapacity, undue influence, fraudulent inducement, intentional interference with testamentary expectancy, a "contract to

                                            - 5 -

adopt" theory, and estoppel by "equitable adoption." *Id.* The wife as executor moved to dismiss the action based on failure to state a cause of action, which the circuit court granted, but the Illinois Supreme Court reversed the dismissal, adopting the concept of "equitable adoption" to confer standing on James to contest the will and allow him to pursue his action seeking to set aside the will to obtain an inheritance as Donald's adopted son.

¶ 15    *DeHart* is both legally inapplicable and factually distinguishable. First, *DeHart* applied the equitable concept of equitable adoption in a common-law will contest action, whereas an adoption proceeding and marital dissolution are both statutory proceedings. "An adoption proceeding *** is a creature of statutory enactment, nonexistent at common law." *In re M.M.*, 156 Ill. 2d 53, 62 (1993) (citing *Regenold v. Baby Fold, Inc.*, 68 Ill. 2d 419, 436-37 (1977), *Musselman v. Paragnik*, 317 Ill. 597, 599 (1925), 2 C.J.S. *Adoption of Persons* § 3 (1972), *In re Fucini*, 44 Ill. 2d 305, 310 (1970), and *Lindsay v. Lindsay*, 257 Ill. 328, 335 (1913)). See also *In re K.J.*, 381 Ill. App. 3d 349, 351 (2008) ("proceedings under the Juvenile Court Act and Adoption Act were created by statute and were unknown at common law"). "Because the common law did not provide for the adoption of children, adoption rights and duties are determined by statute." *In re Estate of Edwards*, 106 Ill. App. 3d 635, 637-38 (1982) (citing *McNamara v. McNamara*, 303 Ill. 191, 196 (1922)). Adoption has always been only a statutory right and was unknown at common law. As our supreme court explained long ago:

> "The present statute of Illinois in relation to the adoption of children was approved on February 27, 1874, and went into force on July 1, 1874. [Citation.] The right of adoption, as conferred by this statute, was unknown to the common law, and is taken from the Roman law." *Watts v. Dull*, 184 Ill. 86, 90 (1900).

¶ 16    Because failed adoptions occurred with inequitable results to children who believed they were adopted but were not and were thus foreclosed from inheritance, our precedent developed an exception for a "contract to adopt" in the context of inheritance. As explained in *In re Estate of Edwards*, 106 Ill. App. 3d 635, 637 (1982), "[i]n Illinois the cases in the area of failure to follow the statute for adoption have proceeded on a contract theory." See also *Monahan v. Monahan*, 14 Ill. 2d 449, 452 (1958). The "contract to adopt" could be based on an actual written contract (see, *e.g.*, *Weiss v. Beck*, 1 Ill. 2d 420, 426 (1953)) or an oral contract, by clear and convincing evidence (*Monahan*, 14 Ill. 2d at 452).

¶ 17    Nicholas cites to *Monahan v. Monahan*, 14 Ill. 2d 449 (1958), which developed the "contract to adopt" theory. In *Monahan*, there was an oral contract by the decedent to adopt the plaintiff, but the circuit court held that the plaintiff was not a legally adopted son of the intestate and therefore was not entitled to inherit his share of the intestate's property. The Illinois Supreme Court reversed and remanded the case to the circuit court to allow proof of an oral contract to adopt. *Monahan*, 14 Ill. 2d at 454. Nicholas also cites to *Dixon National Bank of Dixon v. Neal*, 5 Ill. 2d 328 (1955), where our supreme court affirmed the circuit court's decree awarding an adopted child a partition of his deceased parents' land because there was a valid contract to adopt. Both *Monahan* and *Neal* relied on proof of a contract to adopt. The supreme court in *Neal* held that "it has become the settled rule of law that to be entitled to a decree for specific performance of a contract for adoption it is necessary that the contract be proved as alleged by evidence that is clear and convincing." *Neal*, 5 Ill. 2d at 331.

¶ 18    The "contract to adopt" theory is limited to the enforcement of contract rights and does not confer the rights or legal consequences of a statutory adoption. In *In re Estate of Edwards*, 106 Ill. App. 3d 635 (1982), the court held that proof that the foster parents had an oral contract to

- 6 -

adopt the child, which became impossible upon the child's death, did not allow the parents to maintain a wrongful death action for the child's death as the child's next of kin under the wrongful death statute. *In re Estate of Edwards*, 106 Ill. App. 3d at 638-39. The appellate court held that "[p]roof of the elements of an oral contract to adopt merely permits the enforcement of contract rights; it does not create a parent-child relationship or afford all of the legal consequences of a statutory adoption." *In re Estate of Edwards*, 106 Ill. App. 3d at 638. The court thus affirmed the dismissal of the action.

¶ 19     Perhaps in part due to "contract to adopt" theory's failure to achieve the legal consequences of a statutory adoption, in *DeHart* our supreme court drew a distinction between the equitable concept of "equitable adoption" and the "contract to adopt" theory. The court stated that "the concept of 'equitable adoption' is somewhat murky because many states seem to equate the theory of equitable adoption with a contract-to-adopt theory" by applying "estoppel or quasi-contract considerations where there has been clear proof of a contract, expressed or implied, reliance upon the parent-child relationship, and performance of obligations under the *de facto* relationship," citing to our own court decisions, most notably *In re Estate of Edwards*. *DeHart*, 2013 IL 114137, ¶ 52. The court noted that this analysis made the concept of equitable adoption "essentially indiscernible from the Illinois cases involving a failure to follow the statute for adoption that have proceeded on a contract theory." *Id.*

¶ 20     Thus, the court instead adopted the holding of the California Supreme Court in *In re Estate of Ford*, 82 P.3d 747, 754 (Cal. 2004), where the court held that an equitable adoption could occur without this requirement of a contract to adopt. *DeHart*, 2013 IL 114137, ¶ 59. The court relied on the California Supreme Court's finding that an intent to adopt "may be shown by 'proof of other acts or statements directly showing that the decedent intended the child to be, or to be treated as, a legally adopted child, such as *an invalid or unconsummated attempt to adopt*, the decedent's statement of his or her intent to adopt, the child, or the decedent's representation to the claimant or to the community at large that the claimant was the decedent's natural or legally adopted child.' " (Emphasis added.) *DeHart*, 2013 IL 114137, ¶ 54 (quoting *Ford*, 82 P.3d at 754).

¶ 21     The court similarly relied on the rationale of the holding of the Supreme Court of West Virginia in *Wheeling Dollar Savings & Trust Co. v. Singer*, 250 S.E.2d 369, 373-74 (W. Va. 1978), where "[t]he court noted that circumstances that tend to show the existence of an equitable adoption include the following: the benefits of love and affection accruing to the adopting party; the performances of services by the child; the surrender of ties by the natural parent; the society, companionship and filial obedience of the child; *an invalid or ineffectual adoption proceeding*; reliance by the adopted person upon the existence of his adopted status; the representation to all the world that the child is a natural or adopted child; and the rearing of the child from an age of tender years by the adopting parents." (Emphasis added.) *DeHart*, 2013 IL 114137, ¶ 53 (citing *Singer*, 250 S.E.2d at 373-74).

¶ 22     Although equitable adoption has been applied in other jurisdictions and is now recognized by our supreme court in the context of inheritance and will contests, it is neither applicable nor appropriate in the context of statutory child custody and divorce proceedings. Equitable adoption has been recognized as a claim only by an adult child who was under the impression that he or she was adopted, is old enough to determine his or her own desire to be recognized as the purported adoptive parents' child for purposes of inheritance, and brings such a claim, and

not the other way around, by a parent who wishes to impose a parent-child relationship on a child and seeks otherwise uncognizable custody rights to the child.[1] As Miki argues, if the concept of "equitable adoption" were applied in the context of child custody proceedings, "every man who dates or is married to a woman who allows the child to call him 'Dad' risks being asked to pay child support when the relationship ends and every woman risks having her former boyfriend/husband petition for custody of her child."

¶ 23     In Illinois standing as a *parent* to seek *custody* of a child is determined by statute and not common law. Standing to seek full care and custody of a minor child as a parent is found within the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/101 *et seq*. (West 2010)), the Illinois Parentage Act (750 ILCS 40/1 *et seq*. (West 2010)), or the Illinois Parentage Act of 1984 (750 ILCS 45/1 *et seq*. (West 2010)). *In re Marriage of Simmons*, 355 Ill. App. 3d 942, 953-54 (2005). In enacting the Parentage Act, the General Assembly established a "statutory mechanism that serves to legally establish parent and child relationships in Illinois." (Internal quotation marks omitted.) *J.S.A. v. M.H.*, 224 Ill. 2d 182, 198 (2007) (quoting *In re Estate of Poole*, 207 Ill. 2d 393, 404 (2003)). "[T]he Parentage Act defines the term 'parent and child relationship' as 'the legal relationship existing between a child and his natural or *adoptive parents* incident to which the law confers or imposes rights, privileges, duties and obligations.' " (Emphasis added.) *J.S.A.*, 224 Ill. 2d at 198 (quoting 750 ILCS 45/2 (West 1998)). In turn, the Illinois Adoption Act provides a clear statutory scheme for completing an adoption to become a parent. See 750 ILCS 50/1 (West 2008). Only Miki has a parent and child relationship with William, as she is William's adoptive parent. Nicholas is not a parent, as he is neither a natural nor adoptive parent.

¶ 24     Second, the present case is entirely different factually and in an entirely different legal posture. In *DeHart*, the will contest action was brought by the purported *adoptee* to assert *his own rights* of inheritance against the estate of his purported adoptive father by reliance on equitable adoption as an estoppel argument, despite *the father's failure* to consummate the adoption, because of the father's holding out of him as his son. In the present case, the roles are reversed; the purported *adoptive father* is seeking to assert his *rights as a purported adoptive father* despite *his own failure* to even file an adoption petition. We strain to understand how or why a party can rely on an estoppel argument for an "equitable adoption" when his own conduct created the problem. Even in applying equitable principles, Nicholas should not prevail because another equitable concept is that a party cannot sleep on his rights. "[E]quity aids the vigilant and not those who sleep on their rights ***." *Bell v. Louisville & Nashville R.R. Co.*, 106 Ill. 2d 135, 146 (1985) (citing *Flannery v. Flannery*, 320 Ill. App. 421, 432 (1943)). The adoption agent visited Miki and Nicholas in September 2008, Miki's adoption of William was finalized on March 4, 2009, and Nicholas was specifically told on August 6, 2010, that he was free to file his stepparent adoption petition. Here, Nicholas knew all he had to do was file his adoption petition and yet failed to do so.

---

[1]Since *DeHart* distinguishes equitable adoption from the "contract to adopt" theory, we do not analyze a contract to adopt theory. We note, however, that even in "contract to adopt" cases, it is again the *child* who appropriately brings the action to enforce the contract to adopt so that an adoption is recognized. *In re Estate of Edwards*, 106 Ill. App. 3d at 638, made clear that *parents* who file a claim under a "contract to adopt" theory obtain merely the enforcement of contract rights and do not create a parent-child relationship or the legal consequences of a statutory adoption.

¶ 25    Pursuant to *DeHart*, our supreme court held that the requirements of stating a claim of equitable adoption are as follows:

> "[W]e hold that a plaintiff bringing an equitable adoption claim must prove an intent to adopt along the lines described in *Ford* and, additionally, must show that the decedent acted consistently with that intent by forming with the plaintiff a close and enduring familial relationship." *DeHart*, 2013 IL 114137, ¶ 59.

¶ 26    In *Ford*, though the California Supreme Court recognized the concept of equitable adoption, it refused to apply it in that case because the child was declared a ward of the state and all parties knew that the child was not the Fords' child and that an adoption never took place. Like the present case, the child was treated like a son and his relationship with the Fords' children was a sibling relationship. *Ford*, 82 P.3d at 749. Also just as in the present case, the Fords never petitioned to adopt the child. Mrs. Ford told a family friend, that "they wanted to adopt" the child, but she was "under the impression that she could not put in for adoption while he was in the home." (Internal quotation marks omitted.) *Ford*, 82 P.3d at 749. The court required a clear and convincing standard of proof. *Ford*, 82 P.3d at 755. The *Ford* court held that there was no equitable adoption. Similar to the facts in *Ford*, Nicholas here "wanted" to adopt William but was "under the impression" that he and Miki had to assemble a number of documents to accompany his adoption petition. The petition was never filed. Since our supreme court relied on and adopted *Ford*, the facts and holding of *Ford* guide us to a similar conclusion to reject equitable adoption in this case.

¶ 27    We note that in both *Ford* and *Singer* the courts noted a failed actual adoption proceeding, which was undertaken and believed to have been consummated, but for some reason was invalid or ineffectual, as one of the factors to establish an equitable adoption. Here, Nicholas failed to even file the adoption petition. He cannot argue he or anyone else believed his adoption of William was ever completed. This is not a case of a clear intent to adopt, evidenced by a failed adoption attempt, as in *DeHart* or *Singer* (discussed in *DeHart*). As Miki argues, the present case is more akin to *Ford*, the holding of which was adopted by our supreme court in *DeHart*.

¶ 28    As Miki's supplemental brief points out in detail, the factual distinctions between *DeHart* and this case are numerous. In *DeHart*, the purported adoptee was held out as the decedent's biological child. Here, William was never held out as Nicholas's biological child; Nicholas, Miki, their families, and everyone else knew that William was not their biological child. Nicholas cannot rely on any holding out of William as Nicholas's adopted son either, because Nicholas knew at all times that he had not yet actually adopted William. In *DeHart*, the purported adoptive father believed he had in fact completed the adoption, and the purported adoptee was not aware for most of his life that he was not the decedent's biological son. In this case there is no question that Nicholas at all times was well aware of the fact that he had not even filed a petition to begin his adoption process of William. Here, in stark contrast to *DeHart*, there was no evidence of the first requirement for recognition of an equitable adoption, an established intent to adopt, as Nicholas never even filed the adoption petition though he was well aware of the requirement and was even reminded by Miki.

¶ 29    Also, a close and "enduring" familial relationship, as required by *DeHart*, adopting *Ford*, is not established by the facts of this case. The purported adoptee in *DeHart* was held out to be the decedent's son and believed he was the decedent's son for his entire life, more than 60 years. The *Ford* court, followed in *DeHart*, guided that "[a] close familial relationship

sufficient to support the decedent's intent to adopt *must persist up to*, or at least not be repudiated by the decedent before, *the decedent's death*." (Emphases added.) *Ford*, 82 P.3d at 754 n.6. This contemplates a child's lifetime of being held out as the purported adoptive parent's child up until the adoptive parent's death. In the present case, Miki and Nicholas had a short-lived relationship and marriage and Miki filed for divorce less than two months after Nicholas was told he could file his adoption petition. Nicholas and Miki began dating in the spring of 2008, William was born on August 5, 2008, and Nicholas and Miki got married in May 2009. Nicholas was told on August 6, 2010, that he was free to file his stepparent adoption petition, and Miki filed for dissolution of marriage on September 24, 2010, less than two months later. One can hardly characterize this short time span as an "enduring" familial relationship. Clearly, the facts of this case do not establish the second requirement of the holding of *Ford* or *DeHart*.

¶ 30    The action in *DeHart* was based, in part, on a claim for inheritance expectancy, which can be a valid claim if one was held out to be a decedent's child for his or her whole life. In contrast, in the context of child custody and dissolution proceedings, there is no such "expectancy."

¶ 31    The *Ford* court, whose guidance and holding was expressly adopted by our supreme court in *DeHart*, held that the California recognition of equitable adoption "does not recognize an estoppel arising merely from the existence of a familial relationship between the decedent and the claimant." *Ford*, 82 P.3d at 753. No matter how much Nicholas argues that Miki "held out" William as Nicholas's adopted son or as part of their "family," the fact remains that at all times Nicholas knew that William was not in fact yet adopted by him and that he in fact had to file an adoption petition but failed to do so.

¶ 32    We further note that in *DeHart*, there were additional allegations of bad faith and undue influence. Here, as Miki correctly states, Nicholas admits he knew had to petition the court to legally adopt William. There was no bad faith conduct in this case.

¶ 33    Nicholas argues that he should not be penalized for his failure to merely complete the "ministerial act" of filing a petition for adoption, as Nicholas fully intended to adopt William. However, the filing of a petition for adoption is not merely a "ministerial act." " 'Adoption is the legal and social process by which a nonbiological parent-child relationship is created.' " *In re Joseph B.*, 258 Ill. App. 3d 954, 963 (1994) (quoting *In re M.M.*, 156 Ill. 2d 53, 62 (1993)). Nicholas alleges that he was under the impression that he and Miki had to assemble a number of documents to accompany his adoption petition and alleges facts that he and Miki were consumed with moving and he also had the daily task of caring for the children. However, Nicholas admits he was informed he only needed to file a petition to adopt and a copy of Miki's order of adoption of William. Yet, Nicholas never performed the simple act of filing a petition to adopt William. Miki had e-mailed Nicholas imploring him to pursue the process of adopting William. Yet, Nicholas still did nothing. This fact is inexplicable given the fact that Nicholas is himself an attorney and is well aware of legal requirements, and is even more inexplicable given the fact that Nicholas followed through with the legal requirements for the adoption of another child, Henry.

¶ 34    Under the facts of this case, William was in the physical custody of Miki who, as an adoptive parent, is the only legal parent William has. Through his marriage to Miki, Nicholas is a stepparent to William. Our statutes already provide routes for nonparents to seek custody. There are three ways in which a nonparent may seek custody of a child: (1) section 601 of the

Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/601 (West 2008)); (2) the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2008)); or (3) the Adoption Act (750 ILCS 50/1 *et seq.* (West 2008)). Nicholas does not seek custody under the Juvenile Court Act of 1987 or the Adoption Act. Instead, he seeks custody under the Illinois Marriage and Dissolution of Marriage Act. However, this route is not available to Nicholas. Section 601(b)(2) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/601(b)(2) (West 2004)) provides that a custody proceeding may be commenced by a nonparent " 'by filing a petition for custody of the child in the county in which he is permanently resident or found, *but only if he is not in the physical custody of one of his parents*.' " (Emphasis added.) *In re R.L.S.*, 218 Ill. 2d 428, 434 (2006) (quoting 750 ILCS 5/601(b)(2) (West 2004)). Our supreme court interpreted this section as a standing requirement for nonparents. *In re R.L.S.*, 218 Ill. 2d at 434-35 (citing *In re Custody of Peterson*, 112 Ill. 2d 48, 52 (1986)). " 'Standing' in this context refers to a statutory requirement the nonparent must meet before the trial court proceeds to the merits of the petition for custody." *In re Custody of M.C.C.*, 383 Ill. App. 3d 913, 917 (2008) (citing *In re R.L.S.*, 218 Ill. 2d at 436).[2] As a nonparent, Nicholas has no standing to seek custody of William. Just as any other stepparent, when the legal parent has physical custody of the children, the stepparent does not have standing to seek custody. See 750 ILCS 5/601(b)(2) (West 2008).

¶ 35        Further, recognizing equitable adoption to grant standing to a party seeking custody in divorce proceedings, when the other party is the only legal parent, deprives the legal parent of his or her fundamental constitutional right to raise his or her children. The due process clause protects a parent's right to bring up his or her children and control their education (*Pierce v. Society of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534-35 (1925)) and the freedom of personal choice in the matters of family life (*Santosky v. Kramer*, 455 U.S. 745, 753 (1982)). Our Illinois Supreme Court has also recognized a parent's fundamental liberty interest in the care, custody and control of his or her children and how to raise them. *In re M.H.*, 196 Ill. 2d 356, 362 (2001).

¶ 36        This fundamental right is not diminished by the fact that the parties are in divorce proceedings, including the fact that Nicholas does have standing for custody and visitation concerning their other child Henry, whom he did adopt with Miki. As our supreme court has recently held, the right of fit parents to decide what is in their children's best interests is of constitutional magnitude and this presumption is not weakened by the fact that the parents are divorcing. *In re Marriage of Coulter*, 2012 IL 113474, ¶ 25. Recognizing equitable adoption by Nicholas in this case would violate Miki's constitutional right as William's legal parent. The fact is that Nicholas had every opportunity to become the legal parent of William through the adoption process but did not do so. Miki then filed for divorce as the sole legal parent of William. Nicholas should not now be allowed the opportunity to use these divorce proceedings to undermine Miki's determinations about how to raise William.

¶ 37        While we can understand how a superficial view of the facts of this case may lead one to feel sympathy for Nicholas, another plausible inference from the facts of this case is that

---

[2]In *In re A.W.J.*, 197 Ill. 2d 492 (2001), the Illinois Supreme Court held that, when used in this sense, "standing" does not have the traditional meaning of a requirement that a litigant has a justiciable interest in a controversy; rather, it merely refers to a threshold issue that must be determined before the court may proceed to a "best interests" determination. *In re A.W.J.*, 197 Ill. 2d at 496-97.

Nicholas never took the required steps to adopt William because the marriage was falling apart, and then decided to assert his "right" to William only in a contentious divorce proceeding. Recognizing "equitable adoption" in the context of our family law statutes, including in divorce proceedings pursuant to the Illinois Marriage and Dissolution of Marriage Act, would create many more problems than it would solve and would open the door to abuse and protracted litigation by divorcing spouses. As the *Ford* court cautioned, "a rule looking to the parties' overall relationship in order to do equity in a given case, rather than to particular expressions of intent to adopt, would necessarily be a vague and subjective one, inconsistently applied, in an area of law where 'consistent, bright-line rules' [citation] are greatly needed." *Ford*, 82 P.3d at 753.

¶ 38       Our statutes provide a clear process for asserting parentage of a child and for completing an adoption of a child to create a parent-child relationship that would establish a right to custody and visitation pursuant to a divorce. Maintaining our statutory rules of law clarifies the legal requirements for litigants to assert parentage. Nicholas chose not to complete the legal process and therefore does not have standing. The circuit court did not err in refusing to recognize an "equitable adoption" in this case, and we hold "equitable adoption" does not apply to statutory proceedings for parentage and custody, including under the Illinois Marriage and Dissolution of Marriage Act.

¶ 39                                    II. "Equitable Parent"

¶ 40       Nicholas also argued in the original briefing on appeal that he acted as William's father in every way and has developed a bond with William such that he should be recognized as William's "equitable parent."[3] *DeHart* did not address this doctrine, nor did it shed any new guidance on it, and thus, our prior determination of this issue remains the same.

¶ 41       Nicholas argues that the circuit court erred in declining to find that he was the equitable parent since he was the child's primary caregiver since birth, it would be in the child's best interest, and "the time has come to revisit the equitable parent doctrine in Illinois." Nicholas's supplemental brief is again replete with assertions of his caretaking of and emotions toward William. Yet, he fails to explain why, having full knowledge of statutory adoption requirements, he failed to simply file the paperwork.

¶ 42       In the parties' original briefing, Nicholas relied upon *Koelle v. Zwiren*, 284 Ill. App. 3d 778 (1996), for the proposition that "awarding custody or visitation rights to a nonparent over the objection of a natural parent is permissible if it would be in the best interests of the child." *Koelle*, 284 Ill. App. 3d at 784. However, *Koelle* is readily distinguishable and not applicable to the facts in this case. In *Koelle*, the plaintiff was deceived into believing he was the child's biological father. *Koelle*, 284 Ill. App. 3d at 785. The child was presumed his as it was born during the parties' marriage. Further, the plaintiff in *Koelle* sought only visitation privileges (*Koelle*, 284 Ill. App. 3d at 785), not custody, as Nicholas is seeking in this case.

---

[3]As Miki points out in her supplemental brief, our legislature is currently deciding whether to pass legislation amending the Illinois Marriage and Dissolution of Marriage Act to include, among other things, a definition of an "equitable parent" and giving an "equitable parent" rights under the Act. See 98th Ill. Gen. Assem., House Bill 1452, 2013 Sess. As the legislation is still pending, it does not affect our determination and we apply current Illinois law.

¶ 43   In *Koelle*, we discussed *In re Marriage of Roberts*, 271 Ill. App. 3d 972 (1995), also cited by Nicholas. In *In re Marriage of Roberts*, 271 Ill. App. 3d 972 (1995), the circuit court applied the concept of "equitable parent" and held that a husband's standing in a custody battle was determined by his status of father at the time of the request for relief, even though it was discovered later that he was not the biological father of the child, and awarded custody to the husband. *In re Marriage of Roberts*, 271 Ill. App. 3d at 980. The appellate court in *Roberts* expressly refused to apply the equitable parent doctrine. *In re Marriage of Roberts*, 271 Ill. App. 3d at 980. The appellate court found that awarding custody to the petitioner was permissible even though he was not the natural or adoptive father, but only by applying the best interests of the child standard. *In re Marriage of Roberts*, 271 Ill. App. 3d at 980.

¶ 44   Nicholas sought to apply the rationale of *In re Marriage of Roberts* to this case. However, in *Roberts*, the child was born during the marriage, and thus there was a presumption of paternity under the Illinois Parentage Act of 1984 (*In re Marriage of Roberts*, 271 Ill. App. 3d at 978 (quoting 750 ILCS 45/5 (West 1992))), and the petitioner's wife misled him to believe for a time that the child was his. *In re Marriage of Roberts*, 271 Ill. App. 3d at 978-79. Here, there was no presumption of paternity that would aid Nicholas's position in divorce proceedings. Nicholas was aware at all times he was not the biological father and needed to adopt William.

¶ 45   Nicholas also cites to *In re Custody of Townsend*, 86 Ill. 2d 502 (1981). However, *Townsend* merely recognized that a natural parent's superior right to custody is not absolute but is subject to the best interests of the child. *In re Custody of Townsend*, 86 Ill. 2d at 508. In *Townsend*, a natural father of a child filed a petition for custody of the child who had been in the custody of her half sister since the mother had been incarcerated and the circuit court granted custody to the half sister. Thus, pursuant to statute, the nonparent had standing to seek custody because the child was not in the custody of the natural parent. As noted above, Nicholas is foreclosed from seeking custody as a nonparent under this provision. See 750 ILCS 5/601(b)(2) (West 2008). Here, William is in the custody of his only legal parent, Miki.

¶ 46   Nicholas also cites to *Cebrzynski v. Cebrzynski*, 63 Ill. App. 3d 66 (1978), where an award of custody of a child to a nonparent stepmother over a biological mother was affirmed. However, in that case the nonparent had physical custody of the children, while the natural parent did not have custody. Custody of the children was awarded to the father in his divorce from the biological mother, with the mother having only visitation rights, and after the husband died the children continued residing with the stepmother in her custody. *Cebrzynski*, 63 Ill. App. 3d at 69. Thus, *Cebrzynski* is easily distinguishable and does not apply here. As in *Townsend*, the children were not in the physical custody of the parent. Here, William was in Miki's physical custody. As we have pointed out above, a nonparent may seek custody of a child only when the child is not in the physical custody of one of his parents. 750 ILCS 5/601(b)(2) (West 2008).

¶ 47   None of Nicholas's citations support awarding custody to a nonparent when a parent has physical custody of the child. There is no basis for application of the "equitable parent" doctrine when the child is in the care and custody of a parent. The fact remains that Nicholas did not adopt William and has no standing to seek custody as a nonparent otherwise. The circuit court did not err in granting the section 2-619 motion to dismiss.

¶ 48                                   III. Equitable Estoppel

¶ 49    Nicholas also argues the circuit court erred when it held Miki was not equitably estopped from denying that Nicholas is William's father where petitioner's words and conduct intentionally induced respondent to reasonably believe he was William's father. Among the many acts cited by respondent, he also alleges he performed a vasectomy in reliance on petitioner's misrepresentation.

¶ 50    "To establish equitable estoppel, the party claiming estoppel must demonstrate that: (1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other person intended or reasonably expected that the party claiming estoppel would act upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof." *Geddes v. Mill Creek Country Club, Inc.*, 196 Ill. 2d 302, 313-14 (2001) (citing *Vaughn v. Speaker*, 126 Ill. 2d 150, 162-63 (1988)). We will not reverse a trial court's decision on the issue of estoppel unless it is against the manifest weight of the evidence. *In re Joseph B.*, 258 Ill. App. 3d 954, 975 (1994) (citing *Feiler v. Covenant Medical Center of Champaign-Urbana*, 232 Ill. App. 3d 1088, 1093 (1992)).

¶ 51    Nicholas argues that "Miki knowingly and intentionally misrepresented the nature of Nicholas's and William's relationship that is, she claimed that it was *** that of a parent and a child." However, such an assertion is contrary to the undisputed fact that Nicholas knew at all times that he was not the biological father of William and that formal adoption was necessary. "Equitable estoppel is available only if a party has relied upon another party's misrepresentation or concealment of a material fact." *McInerney v. Charter Golf, Inc.*, 176 Ill. 2d 482, 492 (1997). "Absent such misrepresentation or fraud, the defense is not available." *McInerney*, 176 Ill. 2d at 492 (citing *Ozier v. Haines*, 411 Ill. 160, 165 (1952); *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.*, 114 Ill. 2d 133, 148 (1986)). Additionally, in order to assert equitable estoppel the representation must regard a material fact, not a matter of law; "[a] representation on a matter of law will ordinarily be insufficient to support the basis of an estoppel." *In re Joseph B.*, 258 Ill. App. 3d at 977.

¶ 52    Here, Miki did not misrepresent the material fact that Nicholas would have to undergo the formal adoption process in order to be William's legal parent. Both Miki and William contemplated Nicholas's formal adoption. At no time did Miki claim that Nicholas could be William's legal parent without formal adoption, nor does Nicholas even claim this was the case. There is no reliance by Nicholas upon Miki's alleged acts and statements for his failure to complete the formal adoption process. In fact, Miki herself urged Nicholas to file the adoption petition for William, by Nicholas's own admission in his affidavit. There was no misrepresentation at any point by Miki, and thus Nicholas does not have a case for equitable estoppel.

¶ 53    However, even assuming *arguendo* that Nicholas purportedly relied on Miki's alleged acts of holding him out as William's father in not undergoing the formal adoption process, we hold such reliance was not reasonable. A party can invoke the doctrine of equitable estoppel only when she reasonably relies on another party's conduct or representations in forbearing suit. *In re Joseph B.*, 258 Ill. App. 3d at 975 (citing *In re Custody of D.A.*, 201 Ill. App. 3d 810, 820 (1990), and *Kapp v. Alexander*, 218 Ill. App. 3d 412 (1991)). See also *In re Custody of D.A.*,

- 14 -

201 Ill. App. 3d 810, 821 (1990) (holding the father's petition to establish paternity rights was barred by the statute of limitations in the Illinois Parentage Act where his delay in filing the petition was not reasonable; regardless of mother's earlier representations that he was child's father, he "was free to initiate an action whereby he could obtain legal recognition of his rights as [a] father"). Nicholas knew at all times that he would have to formally adopt William in order to be his legal parent. Yet, during the entirety of the parties' marriage, from May 2009 to September 2010, Nicholas did not file a petition to adopt William. We find that, under the facts of this case, equitable estoppel is not available and not appropriate. The circuit court's refusal to apply equitable estoppel in this case was not against the manifest weight of the evidence.

¶ 54                                    IV. *Parens Patriae*

¶ 55        Finally, in the parties' original briefing, Nicholas further argued that the circuit court erred by not exercising a plenary *parens patriae* power to afford respondent standing regardless of the statutory scheme in order to protect William's best interest. *DeHart* did not rest its holding on this doctrine nor discuss it. Our prior decision remains the same. This doctrine does not confer standing on Nicholas either.

¶ 56        " '[E]ach branch of government has concurrent powers and responsibilities that are in the nature of *parens patriae*.' " *In re D.S.*, 198 Ill. 2d 309, 328 (2001) (quoting *In re S.G.*, 175 Ill. 2d 471, 488 (1997)). The doctrine of *parens patriae* " 'represents an expression of the general power and obligation of the government as a whole to protect minors and the infirm.' " *In re D.S.*, 198 Ill. 2d at 328 (quoting *In re S.G.*, 175 Ill. 2d at 488). "[T]he *parens patriae* power, which gives the court authority to care for infants and to protect them from neglect, abuse and fraud, is codified in the Juvenile Court Act [of 1987 (705 ILCS 405/1-1 *et seq.* (West 1994))]." *In re K.S.*, 264 Ill. App. 3d 963, 967 (1994) (citing *People ex rel. Wallace v. Labrenz*, 411 Ill. 618 (1952)). However, "[t]he *parens patriae* power cannot extend the court's jurisdiction beyond that granted by the Juvenile Court Act." *In re K.S.*, 264 Ill. App. 3d at 967. Nicholas cites to no provision within the Juvenile Court Act to support his invocation of the *parens patriae* doctrine to recognize Nicholas as William's legal father.

¶ 57        The *parens patriae* doctrine is also expressly incorporated into the jurisdictional section, section 601(a), of the Illinois Marriage and Dissolution of Marriage Act. *Milenkovic v. Milenkovic*, 93 Ill. App. 3d 204, 213 (1981). However, the court's emergency *parens patriae* power under section 601(a) of the Illinois Marriage and Dissolution of Marriage Act "is considered extraordinary and is not intended as the basis of jurisdiction for general custody disputes between parents and others." *Milenkovic*, 93 Ill. App. 3d at 213 n.8 (citing Ill. Ann. Stat., ch. 40, ¶ 601, Historical and Practice Notes, at 7 (Smith-Hurd 1980)). Nicholas has not cited any support for his request to invoke this extraordinary power of the court to confer standing on him to seek custody of a child who is legally not his child. There is no authority to confer standing on Nicholas as William's father.

¶ 58                        V. Adjudication That William Was Fatherless

¶ 59        According to Nicholas in the parties' original briefing, the trial court erred in adjudicating William fatherless, and no public policy is served by such a result. However, we note that the

Illinois Supreme Court has specifically held that no liberty interest exists with respect to a child's psychological attachment to a nonbiological parent. See *In re Marriage of Simmons*, 355 Ill. App. 3d 942, 956 (2005) (citing *In re Petition of Kirchner*, 164 Ill. 2d 468 (1995)). Miki completed her legal adoption of William as a single parent in Wisconsin. See Wis. Stat. Ann. § 48.82(1)(b) (West 2008) (providing for adoption by a single unmarried adult). Nicholas cites to no authority that supports his argument that a child is required to have an adjudicated father. As such, we affirm the circuit court's dismissal.

¶ 60                                          CONCLUSION

¶ 61        We affirm the circuit court's dismissal due to Nicholas's lack of standing because: (1) Illinois has not adopted the "equitable parent" doctrine and Nicholas has no standing as a parent to seek custody under the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/101 *et seq*. (West 2010)), the Illinois Parentage Act (750 ILCS 40/1 *et seq*. (West 2010)), or the Illinois Parentage Act of 1984 (750 ILCS 45/1 *et seq*. (West 2010)); (2) equitable estoppel does not apply here due to Miki's holding out of Nicholas as a parent, where Nicholas was aware at all times that William was not his biological child and that formal adoption was necessary; (3) Illinois does not recognize "equitable adoption" in child custody proceedings and a "contract to adopt" theory does not apply because here there was no contract; (4) there is no basis to invoke the *parens patriae* power under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq*. (West 2010)); and (5) there is no requirement that William must be adjudicated to have a father and Miki legally adopted William as a single person.

¶ 62        Affirmed.

¶ 63        JUSTICE MASON, specially concurring.

¶ 64        I concur in the conclusion of the majority that the reasoning of *DeHart v. DeHart*, 2013 IL 114137, cannot be extended to give Nicholas standing to seek custody of William. Because my reasons for reaching that conclusion differ from the majority's and because I do not agree with certain of the majority's premises, I write separately.

¶ 65        The facts here, taken as true for purposes of this appeal,[4] present a convincing case that a contract to adopt William existed between Nicholas and Miki and that with Miki's encouragement and consent, Nicholas assumed the role of William's father from birth. Miki expressly contemplated that after her adoption of William as a single parent was finalized, Nicholas would adopt William. To that end, even prior to the parties' marriage, William's birth certificate listed "Gansner" as his last name as did the church records where William was baptized. After the parties married in May 2009, they participated in a stepparent screening in June. The report generated following the screening recited, "[i]t is Miki and Nick's intention to have Nick adopt William as a stepparent this summer." Miki and Nicholas told their family and friends of their plans to have Nicholas adopt William. Nicholas was listed as William's father on school records. Miki and Nicholas later completed the adoption of Henry, referring to him

_____

        [4]Indeed, pursuant to section 2-619, Miki's motion to dismiss concedes the sufficiency of the allegations of Nicholas's petition to state a claim, but asserts that the claim is barred by other affirmative matter, in this case, standing. 735 ILCS 5/2-619(a)(9) (West 2010); *In re Parentage of M.J.*, 203 Ill. 2d 526, 529 (2003).

as William's "brother" and themselves as the "Gansner family." The record contains ample evidence (again accepted as true for purposes of Miki's motion to dismiss) that Nicholas has acted as William's father since William's birth–caring for him, supporting him (often in Miki's absence), in short, doing everything one would expect a father to do.

¶ 66       As the majority notes, the supreme court observed in *DeHart* that the concept of equitable adoption was "somewhat murky" because many reported decisions analyzed what were essentially "contract-to-adopt" claims under equitable principles. *DeHart*, 2013 IL 114137, ¶ 52. Courts faced with such claims used the fiction of a contract-to-adopt between a parent and child to justify recognizing in equity children who were not legal heirs (defined by statute) of the deceased parent's estate.

¶ 67       But here the analysis is straightforward–the foregoing evidence in the record supports the existence of an express oral contract between Miki and Nicholas. Nicholas performed the contract by acting and being recognized by Miki as William's father from birth; the only thing Nicholas failed to do was the "simple act" of filing the petition to adopt. If *DeHart*'s recognition of equitable adoption applies outside the context of a child's standing to claim an inheritance from a decedent's estate,[5] it would be difficult to imagine more compelling circumstances than those presented here. Thus, I disagree with the majority's conclusion that, on the facts presented, Nicholas has not made out a claim, under either an equitable parent or equitable adoption theory.[6]

¶ 68       According to the majority, another factor weighing against Nicholas's claims, again utilizing factors articulated in the inheritance context, is that Nicholas never held William out as his "biological" or "adopted" son. Of course, neither of those adjectives would have been accurate. What the record does show is that Nicholas (and Miki) held William out to family, friends, church, school, doctors–in other words, the wider community–as Nicholas's "son." The fact that the parties did not attach an adjective to that noun is irrelevant. Indeed, it would be curious if upon completing the adoption, Nicholas began referring to William as his "adopted" son, when he had never felt the need before then to qualify his role as William's father.

¶ 69       The majority also concludes that Nicholas "slept on his rights" or is otherwise chargeable with an unconscionable delay in asserting them. The concept of *laches* as a defense to an equitable adoption claim is somewhat counterintuitive. After all, the premise of the claim is an unconsummated adoption and the passage of a considerable amount of time during which the putative adoptee was treated as the decedent's child.

---

[5]The irony in this case, of course, is that had Nicholas died, William would clearly have had standing to pursue an equitable adoption claim as his heir, despite Nicholas's failure to complete the adoption. But because Nicholas lived, a court is not entitled to consider whether recognition of that same relationship would be in William's best interests. See *Atkinson v. Atkinson*, 408 N.W.2d 516, 519 (Mich. Ct. App. 1987) (extending equitable adoption to provide nonbiological father the right to custody and visitation: "[i]t is only logical that a person recognized as a natural parent in death should have the same recognition in life").

[6]I do agree that the facts do not support an equitable estoppel theory against Miki. Nicholas does not identify any fraud or misrepresentation by Miki and he was undoubtedly aware of the need to file a petition in order to complete his legal adoption of William.

¶ 70    But if *laches* is available as a defense, the facts of this case do not support the conclusion that Nicholas's delay should preclude him from pursuing his claims. *Laches* does not arise simply by virtue of the passage of time; rather, the delay must be unreasonable and must work to the disadvantage of the party asserting the defense. *First National Bank of Springfield v. Malpractice Research, Inc.*, 179 Ill. 2d 353, 364 (1997); *Monson v. County of Grundy*, 394 Ill. App. 3d 1091, 1094 (2009) (*laches* requires showing that (1) party guilty of unreasonable delay in asserting claim and (2) opposing party has been prejudiced by delay).

¶ 71    First, I do not believe the facts here support the conclusion that Nicholas's delay was unreasonable. William was born August 5, 2008. By that time Nicholas and Miki were cohabitating along with Miki's adopted daughter Elizabeth, then age one, and had agreed that once Miki's single-parent adoption of William was finalized, Nicholas would likewise adopt William. Miki's adoption of William was finalized in March 2009 and the stepparent screening necessary to allow Nicholas to petition to adopt William was completed in June 2009. Between June 2009 and September 2010, when Miki filed her petition for dissolution, Nicholas studied for and took the Illinois Bar Exam, the parties relocated to Illinois during the summer and adopted another son, Henry, born September 16, 2009. After the move to Illinois, Nicholas, who was then unemployed, and Miki, who traveled regularly for work, were responsible for the care of three children under the age of three. At some point after the move, Nicholas returned to Wisconsin to obtain a copy of William's adoption order, which was required to be attached to Nicholas's adoption petition and which the parties could not locate in their home. Nicholas was briefly employed from December 2009 until April 2010, during which time he, Miki and Miki's family shared responsibility for the children's day-to-day needs. Nicholas was again unemployed from April 2010 until August 2010, when he started another job. Certainly one can envision that a 15-month span of time consumed with three young children, an interstate move, and two new jobs might result in certain details slipping through the cracks.

¶ 72    The record also contains an August 6, 2010 e-mail from the social worker who performed the stepparent home study a year earlier telling Nicholas to "[f]eel free to file your step parent adoption." The genesis and timing of this e-mail is unexplained, but it is apparent that within a month prior to the filing of Miki's dissolution petition, Nicholas contemplated finalizing William's adoption. Finally, Nicholas promptly asserted his claims following the filing of Miki's dissolution petition. Thus, I cannot agree that any delay by Nicholas was unreasonable.

¶ 73    Second, the record does not reveal any basis upon which Miki could claim to be prejudiced by Nicholas's delay. Up until the time Miki cut off all contact between Nicholas and William, Nicholas continued to fulfill his role as William's parent. Nothing Nicholas did lulled Miki into believing that he did not intend to continue in that role or that he had abandoned their mutual plan for him to adopt William. Based on the record before us, as important as it was for Nicholas to take the final step to assure his legal status as a parent *vis-à-vis* William, I cannot agree that his delay would result in a forfeiture of his ability to do so.

¶ 74    The majority speculates as to Nicholas's motive to delay filing the petition. This point need not be addressed as there is no evidence in the record to support it. Furthermore, the fact that Nicholas is pursuing this appeal (to the point of petitioning our supreme court to grant him leave to appeal) persuades me of the *bona fides* of his intentions.

¶ 75    The majority draws a distinction between the factual scenarios presented in *DeHart*, *Monahan v. Monahan*, 14 Ill. 2d 449 (1958), and *In re Estate of Ford*, 82 P.3d 747 (Cal. 2004), a case specifically relied upon in *DeHart*, based on the fact that the foregoing cases all

- 18 -

involved common-law claims against a decedent's estate, while this case is governed by statute. The majority finds the doctrine of equitable adoption "neither applicable nor appropriate in the context of statutory child custody and divorce proceedings." *Supra* ¶ 22. I agree that under the present state of the law, the doctrine of equitable adoption and the concept of an equitable parent are inapplicable in this case. I do not agree, however, that their application in this context would be "inappropriate."

¶ 76     As the majority notes, the adoption of a child was unknown at common law and has always been governed by statute. *In re M.M.*, 156 Ill. 2d 53, 62 (1993). But the fact that the subject matter of a dispute is governed by statute does not necessarily compel the conclusion that common-law causes of action are unavailable. In *In re Parentage of M.J.*, 203 Ill. 2d 526 (2003), an unmarried woman pursued claims for support under the Illinois Parentage Act of 1984 (750 ILCS 45/1.1 (West 2010)) (Parentage Act), and at common law against her former paramour alleging that he had encouraged and orally consented to artificial insemination and promised to support any children born as a result. Our supreme court found that the Parentage Act unambiguously requires a "husband's" written consent to *in vitro* fertilization of his "wife." Without deciding whether the Parentage Act could apply to an unmarried couple, the court found that the mandatory requirement of written consent precluded its application in any event. *Id.* at 535.

¶ 77     But despite the court's conclusion that the Parentage Act did not apply, the court reversed dismissal of the mother's common-law causes of action for support based on theories of oral contract and estoppel, based, in part, on the court's recognition that "[i]n its current form, the Illinois Parentage Act fails to address the full spectrum of legal problems facing children born as a result of artificial insemination." *Id.* at 536. The court reasoned that in light of the public policy expressed in the Parentage Act recognizing the right of every child to the "physical, mental, emotional, and monetary support of his or her parents" (750 ILCS 45/1.1 (West 2010)), as well as the State's strong interest in protecting and promoting the welfare of its children, "cases involving assisted reproduction must be decided based on the particular circumstances presented." *In re Parentage of M.J.*, 203 Ill. 2d at 539.

¶ 78     Based on its examination of the Parentage Act, the court concluded that "if the legislature had intended to bar common-law actions for child support, it would have clearly stated its intent" and that the court would not "imply a legislative intent where none is expressed." *Id.* at 540. Finding that the best interests of children and society at large would be served, the court determined that parental responsibility could be imposed predicated on "a deliberate course of conduct with the precise goal of causing the birth of these children." *Id.* at 541. "[I]f an unmarried man who biologically causes conception through sexual relations without the premeditated intent of birth is legally obligated to support a child, then the equivalent resulting birth caused by the deliberate conduct of artificial insemination should receive the same treatment in the eyes of the law." *Id.*

¶ 79     Following *In re Parentage of M.J.*, another division of this court decided *In re T.P.S.*, 2012 IL App (5th) 120176. In *In re T.P.S.*, two women in a long-term relationship agreed to conceive two children by artificial insemination, with the children to be borne by the younger partner. *Id.* ¶ 6. After the children were born, the nonbiological parent assumed primary responsibility for their full-time care and was actively involved, with the consent and encouragement of her partner, in every aspect of their lives. The parties were granted co-guardianship of both children after a court found it would be in the children's best interests.

*Id.* ¶¶ 10-12. After the relationship ended and the natural mother cut off all contact between the children and her former partner, the nonbiological parent filed a petition seeking to establish parentage, custody and visitation. *Id.* ¶ 16.

¶ 80 The court reversed the trial court's dismissal of certain of the nonbiological parent's common-law claims. Relying heavily on the supreme court's analysis in *In re Parentage of M.J.*, the court addressed the legislature's intent with respect to common-law claims for parental rights in cases involving children born from artificial insemination. *Id.* ¶ 32. The court found that children conceived as a result of artificial insemination are entitled not only to their parents' monetary support, but also their physical, mental and emotional support as well. *Id.* ¶ 36. Consequently, the court determined that nothing in the Parentage Act precluded the nonbiological partner's common-law claims to establish her parental rights.

¶ 81 Like the Parentage Act, it is also true that the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/101 *et seq.* (West 2010)) (Dissolution of Marriage Act), in its current form, "fails to address the full spectrum of legal problems" facing modern families in dissolution proceedings. *In re Parentage of M.J.*, 203 Ill. 2d at 536. Nicholas, who is neither the biological nor adoptive parent of William, lacks statutory standing to petition for custody or visitation, but he has acted as William's father since birth. Further, because adoption is strictly controlled by statute, Nicholas's failure to file an uncontested stepparent adoption petition precludes him from achieving any relationship with William recognized under current law, despite the fact that it was clearly Nicholas's and Miki's intention that he would do so. For reasons discussed below, I agree with the majority's conclusion that Nicholas's common-law theories are not viable. But, contrary to the majority, I believe that amending the statutes governing these issues to recognize such equitable claims would be entirely appropriate.

¶ 82 The dynamics of family relationships have changed dramatically over time. The predominance of families consisting of biological parents and their biological offspring has given way to single parents, unmarried or same sex couples (who may now legally marry) with (a) biological children from the current or a previous relationship, (b) children adopted by one of the partners or (c) children conceived through artificial insemination, blended families, grandparents assuming the roles of parents and dozens of other variations. The one constant concern in the ever-changing landscape of adult human relationships has been and always should be the best interests of the child.

¶ 83 Legislation cited by the majority touching upon the parent-child relationship reinforces the primacy of the best interests of the child. See 750 ILCS 5/102 (West 2010) (the Dissolution of Marriage Act shall be "liberally construed *** to promote its underlying purposes to" "(2) *** safeguard family relationships"; "(4) mitigate the potential harm to *** children caused by the process of legal dissolution of marriage"; "(7) secure the maximum involvement and cooperation of both parents regarding the physical, mental, moral and emotional well-being of the children"); 750 ILCS 45/1.1 *et seq.* (West 2010) ("Illinois recognizes the right of every child to the physical, mental, emotional and monetary support of his or her parents ***."); 750 ILCS 50/15 (West 2010) ("The welfare of the child shall be the prime consideration in all adoption proceedings."). But under our current statutory scheme, courts are precluded from addressing that overarching interest by a statutory definition of "parent" that excludes many who have willingly assumed that role with the consent and encouragement of the child's legal parent and who are willing to continue the relationship to the benefit of the child or children involved.

¶ 84    I cannot accept the majority's "parade of horribles" argument in which recognition of an equitable parent will lead to myriad spurious custody and visitation disputes. The majority posits a scenario (advocated by Miki) in which a man cohabitating with a mother and her children (who are encouraged to call him "dad") will then assert custody or visitation rights against the mother when the relationship sours. I agree that in this scenario, without more, an unmarried man who is neither the biological nor adopted father of the children would have little basis to assert a claim; and a pleading alleging nothing more than the hypothetical would properly be dismissed at the pleading stage.

¶ 85    But the fact that courts may have to deal with spurious claims is no reason to prohibit all such claims. Trial judges are adept at recognizing frivolous claims and Illinois Supreme Court Rule 137 remains a powerful tool to punish those who would assert claims without a factual basis and dissuade others from doing the same. Ill. S. Ct. R. 137 (eff. Aug. 1, 1989). Further, I assume that one who seeks to achieve the status of "parent" under an equitable adoption or equitable parent theory would still be required to establish the claim by clear and convincing evidence, a standard of proof that further discourages the assertion of baseless claims.

¶ 86    The majority's focus on Miki's constitutional rights as William's adoptive mother is, in my view, misplaced. While, without more, Miki, as William's adoptive mother, would be entitled to assert her superior rights to make decisions regarding William's care, custody and control (*Troxel v. Granville*, 530 U.S. 57, 65 (2000); *In re M.H.*, 196 Ill. 2d 356, 362 (2001)), the evidence in the record establishes beyond argument that from the time of William's birth in August 2008 until the filing of her petition for dissolution in September 2010, Miki ceded to Nicholas the ability and authority to participate in William's upbringing as his father. The facts alleged by Nicholas show that Nicholas gave William his name, cared for William, attended to his daily needs and was held out by Miki to the world as William's father. That Miki has now changed her mind about the viability of the parties' relationship does not entitle her to rewrite history in order to invoke the superior rights doctrine. See *In re M.M.D.*, 213 Ill. 2d 105, 115-16 (2004) (Despite the supreme court's earlier decision declaring amendments to the Illinois Marriage and Dissolution of Marriage Act providing for grandparent and sibling visitation unconstitutional, the court upheld voluntary visitation agreement entered into between grandparents and child's father: "If fit parents have a fundamental right to make decisions regarding the care, custody and control of their children, *** they must likewise have the fundamental right to agree to visitation by the children's grandparents if they wish to do so."); *In re T.P.S.*, 2012 IL App (5th) 120176, ¶ 61 ("Although Dee is the only biological parent, there is no constitutional provision that prohibited Dee from voluntarily entering into a coparenting agreement with her partner for the specific purpose of creating a family through assisted reproduction technology and agreeing to coparent any children produced as a result of the agreement.").

¶ 87    But as much as I believe courts should be able to make custody determinations in a wide variety of contexts beyond those involving biological or adoptive parents when in furtherance of a child's best interests, I also believe the legislature is better suited to address the means by which to do so. Nicholas seeks custody of William. Custody, which entails the ability to have a say in the care and upbringing of a child, is fundamentally different than visitation or, for that matter, support. Developing the concept of equitable adoption in the child custody context or acknowledging the ability of equitable parents to seek custody without a statutory framework is an *ad hoc*, unpredictable process. Recognizing equitable adoption, not as a means to secure

an inheritance, but as an alternative to a statutory adoption procedure, is a substantial departure from settled law. Longstanding authorities have recognized that the doctrine of equitable adoption "cannot be used to create a parent-child relationship or afford all of the legal consequences of a statutory adoption." *In re Estate of Edwards*, 106 Ill. App. 3d 635, 638 (1982). But recognition of the doctrine in this case would have that effect. Expanding the definition of "parent" to include individuals other than natural or adoptive parents would likewise greatly alter the nature and scope of custody determinations and implicate a delicate balancing of the interests of *de facto* parents against those of biological or adoptive parents.

¶ 88    It could be said that the decision in *In re T.P.S.* was a logical extension of the supreme court's decision in *In re Parentage of M.J.*: if children conceived via artificial insemination are entitled to their parents' monetary support, they should be entitled to their parents' physical, mental and emotional support as well. But that logic does not transition easily to this case. On a purely factual level, Nicholas's role *vis-à-vis* William is unlike those of the putative parents in *In re Parentage of M.J.* and *In re T.P.S.* Those courts emphasized that the children whose rights were at issue were deliberately brought into this world as a result of the conscious choice of the adults involved. *In re Parentage of M.J.*, 203 Ill. 2d at 541 (putative father's actions "demonstrate a deliberate course of conduct with the precise goal of causing the birth of these children"); *In re T.P.S.*, 2012 IL App (5th) 120176, ¶ 62 ("the nonbiological parent *** actively planned for and participated in the very creation of the children at issue"). The same cannot be said of Nicholas. Although he served as William's father from birth, Nicholas did not participate in the process of bringing William into existence and Miki had begun the adoption process even before she met Nicholas.

¶ 89    But even overlooking factual distinctions, extending the doctrine of equitable adoption and the concept of an equitable parent to the facts presented here is entirely new territory. Courts should hesitate to engraft upon established statutory schemes common-law causes of action founded in equity. Legislative bodies are better equipped to weigh the many public policy considerations inherent in implementing such important changes, particularly where, as here, those changes would significantly affect not just one, but three well-established statutory enactments.

¶ 90    The majority notes correctly that a bill currently pending in the Illinois legislature does not bear directly on this matter. But House Bill 1452, if enacted, would squarely address Nicholas's position in this case. 98th Ill. Gen. Assem., House Bill 1452, 2013-2014 Sess. House Bill 1452 amends a number of statutes, among them the Dissolution of Marriage Act. The proposed bill creates a new section 600, retitled from "Custody" to "Allocation of Parental Responsibilities" and which, in part, defines "parent" under the Act to include, in addition to natural and adoptive parents, an "equitable parent." One of the proposed definitions of "equitable parent" is a person who, although not a legal parent of a child,

> "lived with the child since the child's birth or for at least 2 years, and held himself out as the child's parent while accepting parental responsibilities, under an agreement with the child's legal parent (or, if there are 2 legal parents, both parents) to rear the child together, each with allocated parental rights and responsibilities, provided that a court finds that recognition of the person as a parent is in the child's best interests." 98th Ill. Gen. Assem., House Bill 1452, 2013-2014 Sess., at 117.

The bill would further allow an equitable parent to file a petition seeking "parenting time" with children of the relationship. *Id.* at 119-20.

- 22 -

¶ 91     This legislation, if enacted, would address not only the best interests of children who are the product of relationships like Nicholas's and Miki's, but also those who find themselves in non-traditional families and whose best interests may be served by sustaining relationships with adults who are not their legal parents, but who, with the consent and support of their legal parents, have assumed that role.

¶ 92     This case, which the trial court aptly described as "heartbreaking," is a textbook example of the need for such legislation. In her petition for dissolution, Miki conceded that Nicholas is a "fit and proper person to have joint care, custody, control" over Henry. For all practical purposes, Nicholas's relationship with William is identical to (and of longer duration than) his relationship with Henry. In particular, nothing in Nicholas's failure to file the stepparent adoption petition renders him "unfit" to continue to parent William. Yet, application of statutory standing limitations in this case results in a fractured family in which Henry will continue to know Nicholas as his father, but William, without regard to whether continuation of the parent-child relationship would be in his best interests, will be prohibited from doing the same.